**In the Matter of Martin J. BREEN, Jr., Barbara L. Breen, Debtors.**

**The FIRST NATIONAL BANK DAYTON, OHIO, Plaintiff,**

v.

**Martin J. BREEN, Jr., and Barbara L. Breen, Defendants.**

Bankruptcy No. 3–80–03601.
Adv. No. 3–81–0001.

United States Bankruptcy Court,
S. D. Ohio, W. D.

Sept. 11, 1981.

John M. Slavens, Dayton, Ohio, for plaintiff.

Kenneth J. Arkenberg, Dayton, Ohio, for defendants.

## DECISION FINDING DEBT DISCHARGEABLE

ELLIS W. KERR, Bankruptcy Judge.

## THE PLEADINGS

The Complaint of the Plaintiff, The First National Bank, Dayton, Ohio (Bank) alleged, among other things that the Defendants, the Debtors (Breens) executed a note October 19, 1980, payable to the Bank and secured by a mortgage on real estate; that after default the Bank obtained a judgment; that the Bank would not have made the loan but for representations made in a financial statement that were and known to be false. Prayer is to determine non-dischargeability of debt and for judgment for $20,556.53 plus interest and attorney fees.

The Answer, briefly stated, denies the allegations in the Complaint that the representations were false and known to be false; denies they were made with intent to deceive; denies that Bank relied upon them; and claims the Breens "represented their financial condition only to the best of their knowledge and do not make any representation as to the accuracy of their statement"; that they "were led to believe that other credit investigations would be made upon them before the extension of any loan".

## FINDINGS OF FACTS

The Breens executed on October 19, 1979, a note in the amount of $27,922.20 payable to the Bank. The security listed was "2nd mortgage on Real Estate". (Plaintiff's Exhibit A)

A "Personal Statement" was executed by only the one Debtor, Martin Breen. It listed a $7,000.00 real estate mortgage loan. (Plaintiff's Exhibit B)

On October 19, 1979, the Breens executed a real estate mortgage to the Bank. It described by metes and bounds a 2.52 acre tract in Harrison Township, Montgomery County, Ohio. But the last line in the description is "*now known as 78688 City of Dayton*". (Emphasis added) (Plaintiff's Exhibit C)

The Bank had a title examination made by Security Land Title Agency. Its report is dated October 17, 1979, and indicates the property as "now known 78688 City of Dayton" but refers to copy of Deed which is

that by which Breens acquired title and describes the 2.52 acres with no reference to any Dayton lot. The report lists a $14,-400.00 mortgage to State Fidelity Federal Savings & Loan Assn. (Plaintiff's Exhibit D)

On July 31, 1979, the Breens had given to Fidelity Federal Savings and Loan Association a $34,000.00 mortgage on the 2.52 acres. The description made no mention of Dayton lot. (Plaintiff's Exhibit E)

But before that, on June 28, 1972, the Breens had given the $14,400 mortgage to State Fidelity Federal Savings and Loan Association. The description after metes and bounds of the 2.52 acres ended with "now known as lot number 78688 City of Dayton". (Plaintiff's Exhibit F)

At the end of Plaintiff's case Barbara Breen was dismissed as a party Defendant.

Ronald Hertlein, Senior Vice President of State Fidelity testified that from the $34,-000.00 obtained from the July 31, 1979 mortgage (Ex. E) $11,450.48 was used to pay off an existing loan, $16,390.26 went to GECC and after other payments to settle debts there was a balance of $5,227.15 that was paid Breens; that the monthly payment on the old loan was $150.00 but was $381.39 including interest and taxes on the new loan; that the new loan was based on an appraised value of $44,500.00; and that loan was not closed until August 4, 1979. The testimony being undisputed, is accepted as fact.

Jim Brooks is Assistant Cashier of Plaintiff—Bank. He testified in regard to the October 19, 1979 loan made by the Bank (Plaintiff's Exhibit A and C) and stated he was the Account Manager at the North Dixie office when he met the Debtors; that in September 1979 he discussed with Defendant Martin Breen the desire of the latter to buy a tool related business; that the data on the financial statement (Plaintiff's Exhibit B) was obtained by Brooks asking questions of Breen who gave the value of the real estate as $84,000.00 (the amount listed in the statement was $80,-000.00); that he owed $7,000.00 to State Fidelity; that monthly payments were $130.00 (Hertlein testified $150.00); that Breen signed in his presence but gave no information as to the recent mortgage to the Bank; that Brooks ran a Credit Bureau check which revealed no data different than that given; that he approved a second mortgage loan for $10,000.00 but Mrs. Breen would not sign unless there would be a consolidation of two debts and a loan for $20,000.00 which was approved as being within the cash flow and equity situation; that Brooks contacted Security Land Title for a title search and received the report that the $20,000.00 loan was closed; that $10,000.00 of this went to the Breens and $10,000.00 to Banner the previous owner of the tool business.

On cross-examination Brooks admitted that the Credit Bureau reports showing no judgments would indicate Breen takes care of his obligations; that Brooks did not check the books of the business Breen "had going" nor did he ask for tax returns; that he did not ask if any balance was due on vehicles (3 were listed on the financial statement); that Visa was not contacted in regard to their debts listed; that he did not check the status of the business being bought; and that he went past the real estate and thought it worth $50,000.00. This testimony, being uncontradicted, is accepted as fact.

Defendant Martin Breen testified but could not recall very much. He stated it was Brooks who entered the data in the financial statement but could not remember if he, Breen, read it—could not remember if he even had his glasses with him nor much if anything of his conference with Brooks. Breen did say he "probably" got from the table at home the figures he gave Brooks; that his wife handles all the figures; that he was committed to Kettering Hospital in December 1979; that he had been at the Miami Valley Hospital with a nervous break-down but could not recall when it

was; that he had to go to the VA Hospital the next day; and that he has been in bad shape for seven or eight years.

Breen's condition on the stand was pitiful. He gave the appearance of sincerity. He certainly was not normal mentally or physically.

Barbara Breen, the dismissed Defendant, and wife of Martin Breen could not give any testimony of much value. She stated she handled all bills in the home, all charge accounts and similar matters; that her husband does none of this; that she did not know her husband gave any figures to Brooks and he never told her how he got the figures.

## CONCLUSIONS OF LAW

Whether the Bank relied upon the title examination, had a right to rely upon it and whether it was sufficient are matters not necessary to determine. The title company was agent for the Bank. But comments as to this are appropriate. The testimony of the agent for the title company was not of much help. He explained the recording system in Dayton and that the title report was based upon the Recorder's records as to the lot in Breen's name. There was no explanation as to why further and more detailed examination was not made. The title company had to know that the Dayton lot was "carved out" of a tract described in copy of Deed it had before it (a part of Plaintiff's Exhibit D). A question is raised as to the need to check back on this 2.52 acre tract. Had this been done the July 31, 1979 mortgage to Fidelity Federal Savings and Loan Association would have been discovered.

If the Bank requested a title check as to just the Dayton lot number and did not request a check on *any* mortgage the Breens had given it was not making a credit check it could have made.

Disregarding the foregoing comments this decision *can* be based upon just two conclusions, to-wit:

(1) The Bank did not reasonably rely on the statement. 11 U.S.C. § 523(a)(2)(B)(iii).

(2) The Bank did not sustain the burden of proof that there was an intent to deceive. 11 U.S.C. § 523(a)(2)(B)(iv).

The provisions pertaining to reliance on financial statements and intent to deceive are not new. They are found in the former Bankruptcy Act, Section 17(a)(2). The new Code changed the matter of reliance to *reasonable* reliance.

The history of statutory and case law clearly indicate the need for protection of naive and inexperienced bankrupts from the actions of creditors more sophisticated and knowledgeable (and at times unscrupulous).

It must also be noted that cited cases which were decided prior to 1960 involved still different laws because the so called 1960 "Cellar Amendment" amended 17(a)(2) and 14(c)(3). Among the best decisions discussing the legislative history of these sections are *Seaboard Finance Company v. Barnes*, 378 Mich. 627, 148 N.W.2d 756 (1967) and *Federal Finance Company v. Merkel*, 65 Wash.2d 379, 397 P.2d 436 (1964).

Before the "Cellar Amendment" unscrupulous lenders encouraged issuance of statements omitting debts with the deliberate intention of obtaining false statements to use if the borrower eventually went into bankruptcy. This is pointed out in the Senate Report on the bill which retained the effect of a false statement only on a bankrupt engaged in business. Because of this type of practices there were many cases involving all types of situations and one can find a precedent to sustain almost any type of a situation as evidenced by the many cases set out in the footnotes to the 10 page decision of *Morimura Arai & Company v. Taback*, 279 U.S. 24, 49 S.Ct. 32, 73 L.Ed. 586.

There then followed many cases holding that the reliance on the financial statement must be a reasonable reliance. The new Code then added that the creditor must have "reasonably relied" upon the statement. But what has been held to be rea-

sonable reliance has been, for the most part, based upon the particular facts of each case. The majority of cases make it clear that the creditor has a duty to make a reasonable effort to check the credit rating of the Debtor and not rely upon just the financial statement.

Applying these principles to the instant case we find the Bank did not make such effort and therefore did not reasonably rely on the statement.

The Bank could have had a title examination to determine if the Breens had on record *any* mortgage whether on the Dayton lot or any other property. More important all the Bank had to do was pick up the phone and make a call to Fidelity Federal to ascertain the actual balance and the monthly payments due on the mortgage to that loan association. There could be no excuse of Fidelity refusing to release such information because it was confidential. The Bank could have secured from Breens authorization to release such information. If they had refused it would have been a "red flag" to the Bank.

The intent to deceive poses no problem. The Breens both testified it was the wife who handled all the figures. Considering the mental and physical condition of Mr. Breen it is questionable if he even had the capacity for such intent. If he had been in a normal mental condition it is difficult to understand how he could expect to deceive the Bank, considering the ease with which it could have made a check on his financial condition. In any event, the Bank failed to sustain the burden of proof.

The decision must be in favor of the Defendants—Breens holding the debt dischargeable.

Entry of Judgment shall be made by separate document as required by Rule 921(a), Rules of Bankruptcy Procedure.