In re Raymond L. ALLEN and Elaine M. Allen, Debtors.

SOVRAN BANK, N.A.,
Plaintiff-Appellant,

v.

Raymond L. ALLEN, and, Elaine M. Allen, Defendants-Appellees.

No. 85–777–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

Aug. 7, 1986.

Joseph R. Mayes, Virginia Beach, Va., for plaintiff/appellant.

William F. Burnside, Wolcott, Rivers, Wheary, Basnight & Kelly, P.C., Virginia Beach, Va., for defendants/appellees.

## MEMORANDUM OPINION

WALTER E. HOFFMAN, Senior District Judge.

Sovran Bank, N.A. ("Sovran"), appeals from the Bankruptcy Court's order dismiss-

ing its complaint and holding the $35,681.81 debt of Raymond L. and Elaine M. Allen ("debtors" or "the Allens") dischargeable within the terms of 11 U.S.C. section 523(a)(2)(B). The Bankruptcy Court's opinion rested on its finding that Sovran did not reasonably rely on the Allens' concededly false financial statement. For the reasons stated below, the decision of the Bankruptcy Court is reversed and the case is remanded for further proceedings.

## I. BACKGROUND

### A. Facts

The Allens applied for a $25,000.00 loan from one of Sovran's predecessors, First & Merchants Bank, on April 13, 1983. The stated purpose of the loan was "to clean up all outstanding debt." Both Mr. and Mrs. Allen signed the loan application form, but only Mr. Allen signed the accompanying financial statement. A. Leland Simmons, the loan officer who handled the application, already knew Mr. Allen. As a loan officer with the Bank of Virginia earlier in his twelve-year career, Simmons had overseen certain loans to Mr. Allen. In addition, Simmons knew from internal bank records that Mr. Allen had received loans from First & Merchants Bank in amounts ranging from $2,000.00 to $3,000.00. These loans, according to Simmons, were paid off in a satisfactory manner.

The April 13 financial statement indicated that the net worth of the Allens was $216,798.00. According to the statement, their assets were as follows: $825.00 cash on hand and on deposit; $25,000.00 accounts and notes receivable; $7,400.00 cash value of life insurance; $104,000.00 unencumbered real estate; $60,000.00 interest in Mr. Allen's business, Automobiles, Ltd.; and $40,000.00 silver and gold. In addition, the statement showed the Allens' total income as $40,000.00—$25,000.00 from Mr.

Allen and $15,000.00 from Mrs. Allen. Liabilities of the Allens, on the other hand, were listed as follows: two outright liabilities in the form of a $20,000.00 note payable to the Bank of Virginia and $427.00 owing on a charge account; and one contingent liability, a $50,000.00 obligation assumed as guarantor, endorser, or co-maker of a note. No other liabilities, contingent or otherwise, were mentioned.

Simmons met with Mr. Allen to review the April 13 financial statement. They reviewed the statement line-by-line, and Simmons made notations on the statement during the course of the interview. He noted, for instance, that the $25,000.00 receivable listed as an asset was "secured by land." Simmons, furthermore, penned in "silver & gold" in place of the more general term "personal property," which was claimed to be worth $40,000.00.[1] In the column reserved for data on annual income, Simmons wrote in $15,000.00 as Mrs. Allen's income based on Mr. Allen's representation that she earned $1,000.00 per month. Adding this figure to the $25,000.00 income Mr. Allen listed as his own, Simmons entered $40,000.00 as the total income of the Allens.

The financial statement was false. The Allens' residence was encumbered not only by a deed of trust dated February 9, 1981, in favor of Virginia National Bank securing a note with the principal amount of $78,240.96 and with an amount owing as of April 13, 1983, of $63,027.44,[2] but also by another deed of trust in favor of United Virginia Bank dated March 2, 1983, securing a note in the amount of $50,000.00.[3] Furthermore, the Allens had executed a $50,000.00 note in favor of W.H. Bostron on November 4, 1982.[4] According to their bankruptcy schedules, Mr. Allen's income was $11,027.00 in 1982 and $7,354.00 in 1983; Mrs. Allen's income was $7,675.00 in

---

1. Simmons testified that Mr. Allen explained the $40,000.00 figure as an estimate of jewelry, silver, and gold owned by the Allens. Tr. 10.

2. The note was satisfied on November 25, 1983.

3. The deed of trust was recorded in the Circuit Court for the City of Virginia Beach on March 2, 1983.

4. The note was reduced to judgment on October 5, 1984.

1982 and $6,450.00 in 1983. The $40,000.00 figure of the silver and gold was exaggerated. Finally, as stipulated, the claimed $60,000.00 interest in Mr. Allen's business was false.

Before he approved the loan application accompanied by the false financial statement, Simmons requested a credit report through Retail Merchants Association. The report indicated zero balances on all of Mr. Allen's credit cards except for his United Virginia Bank credit card account, which had an outstanding balance of $462.00. Simmons did not request a merchant's credit report and, as he acknowledged, any commercial debts would not have appeared on the retail credit report that he did receive. Although the initial source for repaying the loan would have been the Allens' business, Simmons testified, the main source of repayment was to be the Allens' residence. If the residence were unencumbered as represented on the financial statement, the property could have been mortgaged in order to satisfy the loan.[5]

On May 13, 1983, the Allens applied for an additional loan of $18,000.00 to "invest in [their] personal business." With this application, the Allens submitted a handwritten document, signed by both of them, making the sources of repayment clear. The statement assured that the loan would be repaid from income generated by the Allens' personal business, Automobiles, Ltd., or by mortgaging their residence if the business did not satisfy the obligation. No additional financial statement accompanied this loan application.

Sovran received a $9,000.00 curtailment on the two loans in August 1983. The loans were renewed several times and, after Simmons had learned of encumbrances on the Allens' residence and of the demise of Automobiles, Ltd., were ultimately consolidated in a $35,681.81 promissory note dated June 11, 1984. No further financial statements were submitted, and no "fresh cash" was involved.

**B. Proceedings in the Bankruptcy Court**

The Allens filed their petition for Chapter 7 relief on February 1, 1985. Sovran thereupon filed a complaint to determine the dischargeability of the debt embodied in the $35,681.81 promissory note. On September 12, 1985, the Bankruptcy Court received evidence and heard arguments of counsel. The Court dismissed the complaint as to Mrs. Allen because she had not signed the financial statement. The Court further held that, in any event, Sovran had not reasonably relied on the financial statement when it initially granted the loan in 1983. Although the statement was undoubtedly false, Sovran had not reasonably relied on it because adequate steps had not been taken to verify the accuracy of the financial statement.[6] In particular, a business credit check had not been ordered instead of, or in addition to, the consumer credit check that had been ordered. Furthermore, the Court held that Sovran had not shown reasonable reliance when it consolidated the loans in 1984 after learning of the encumbrances on the Allens' residence

5. That the residence was encumbered did not come to light until May 1984 when Simmons commissioned a title search. The search discovered the $50,000.00 lien in favor of United Virginia Bank, the additional $70,000.00 lien in favor of Heritage Bank & Trust, and a negative pledge agreement with Bank of Virginia Beach.

6. The Bankruptcy Court stated as follows:
   I would really have to decide if we go back to April 13th that there was not a reasonable reliance upon it [the financial statement] when really this was a business loan. It was handled perhaps in a commercial fashion, but it was for business purposes. And the bank realized that.
   I'm particularly struck by the fact that the bank realized and realizes that it had access to a business inquiry system. Retail Merchants is primary consumer. It had access to the business aspects of it in the community and could have found out something about Automobiles, Limited. Greater inquiry should have been made. I think if I had seen—two, was it reasonable?—$40,000.00 in silver and gold, I'd want to see something on that. I think more inquiry should have been made, even relative to salary.

and of the demise of their business.[7] Having concluded that the element of reasonable reliance had therefore not been met, the Court declined to decide whether Mr. Allen had submitted the statement with intent to deceive.

The above findings and conclusions were incorporated in the final order dated October 29, 1985, granting the Allens' motion to dismiss Sovran's complaint and discharging the debt. Sovran then appealed to this Court.

## II. STANDARD OF REVIEW

The factual findings of bankruptcy judges receive the same deference accorded the factual findings of district judges. "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Bankruptcy Rule 8013; *Melichar v. Ost,* 661 F.2d 300 (4th Cir. 1981), *cert. denied,* 456 U.S. 927, 102 S.Ct. 1974, 72 L.Ed.2d 442 (1982). This standard cannot constitutionally be applied in the review of findings on issues related only peripherally to bankruptcy adjudication. *See 1616 Reminc Ltd. Partnership v. Atchison & Keller Co.,* 704 F.2d 1313, 1318 (4th Cir.1983). Nevertheless, the clearly erroneous standard can apply on this appeal because the findings concern dischargeability, a traditional bankruptcy issue. *See In re Martin,* 761 F.2d 1163, 1166 (6th Cir.1985).

The clearly erroneous standard generally has been considered inapplicable, however, if the trial court grounds its findings on a mistaken impression of applicable legal principles. *See Inwood Laboratories, Inc.*

*v. Ives Laboratories, Inc.,* 456 U.S. 844, 855 n. 15, 102 S.Ct. 2182, 2189 n. 15, 72 L.Ed.2d 606 (1982) (citing *United States v. Singer Manufacturing Co.,* 374 U.S. 174, 194 n. 9, 83 S.Ct. 1773, 1784 n. 9, 10 L.Ed.2d 823 (1963)); *see* also Annot., *Supreme Court's Views as to What Constitutes Factual Issue Under "Clearly Erroneous" Standard of Federal Rule of Civil Procedure 52(a), Providing that Findings of Fact Shall Not Be Set Aside Unless Clearly Erroneous,* 72 L.E.2d 890, 894–98 (1983) (collecting cases). The distinction between factual issues and legal issues is admittedly an elusive one. *See Pullman-Standard v. Swint,* 456 U.S. 273, 288, 102 S.Ct. 1781, 1790, 72 L.Ed.2d 66 (1982) (citing *Baumgartner v. United States,* 322 U.S. 665, 671, 64 S.Ct. 1240, 1243, 88 L.Ed. 1525 (1944)). The distinction nonetheless should be made because the policies of fact-finding expertise and judicial economy supporting the "clearly erroneous" standard do not justify deference to a decision based on a mistaken view of the law. *Cf. Anderson v. Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) ("The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determinations at a huge cost in diversion of judicial resources."). About the best distinction that can be made is to say that questions of fact entitled to deferential review are those questions whose resolution is based ultimately on the application of the factfinding tribunal's experience with the mainsprings of human conduct, whereas

"Let me see your last paycheck or your last tax return," something that would indicate salary.

7. The Bankruptcy Court's findings on this point follow:

But what particularly I think sours the case for the bank here is what occurred on June the 11th in 1984 when it was consolidated into one note, which was an extension. And Mr. Mayes [counsel for Sovran] very well anticipated that the Court would have this concern. By that time the bank had learned of the home mortgages, plural; it had learned of the employment

situation, that he wasn't there any longer. They had or should have known since there was a built-in system of considerable overdraft. Yet, in spite of that the bank went on and granted an extension.

The argument is "Well, you know how it is, they had to do the best they could." But they knew at that time they had been dealing with somebody that was not giving it to them straight. And there's only one thing to do when that occurs.

questions of law not entitled to such deference are those that are based on the application of an abstract legal standard. *See* Note, *Federal Rule of Civil Procedure 52(a) and the Scope of Appellate Fact Review: Has Application of the Clearly Erroneous Rule Been Clearly Erroneous?*, 52 St. John's L.Rev. 68, 87 (1977).

## III. DISCUSSION

Sovran seeks to have the Allens' debt excepted from discharge. The statutory provision governing the exception that it seeks, 11 U.S.C. section 523(a)(2)(B), reads as follows:

### § 523. Exceptions to Discharge

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . . .

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523 (1982).

The financial statement submitted by the Allens concerned their financial condition, and the Bankruptcy Court found that the statement was false. As already noted, the Bankruptcy Court declined to make a finding on whether Mr. Allen submitted the statement with intent to deceive. The element of reasonable reliance, which the Bankruptcy Court found to be lacking, is therefore the basis of Sovran's appeal.

### A. Reasonable Reliance Prior to the Bankruptcy Reform Act

The "reasonably relied" language of subsection 523(a)(2)(B)(iii) was added to the false financial statement exception from discharge with the passage of the Bankruptcy Reform Act of 1978 ("Bankruptcy Code"). *See* Pub.L. No. 95–598, Nov. 6, 1978, § 523, 92 Stat. 2590. The preceding version of the statute, section 17(a)(2) of the old Bankruptcy Act, provided that an individual's debt could not be discharged in bankruptcy if that debt or its renewal is the result of money obtained "in reliance [by the creditor] upon a materially false statement in writing respecting [the debtor's] financial condition made or published . . . with intent to deceive. . . ." Although section 17(a)(2) thus had no reasonableness-of-reliance component, courts read one into the terms of the statute. *Matter of Garman*, 643 F.2d 1252, 1256 (7th Cir.1980) (citing *Carini v. Matera*, 592 F.2d 378 (7th Cir.1979) (per curiam)); *Kentile Floors, Inc. v. Winham*, 440 F.2d 1128 (9th Cir. 1971); *In re Smith*, 424 F.Supp. 858 (M.D. La.1976); *In re Adams*, 368 F.Supp. 80 (D.S.D.1973); *Sweet v. Ritter Finance Co.*, 263 F.Supp. 540 (W.D.Va.1967); *In re Disbrow*, 20 Colliers Bankr. Cases 1149 (D.Vt. 1979); *In re Ducote*, 4 Bankr.Ct.Dec. 943 (W.D.La.1978); *In re Gibbs*, 9 Colliers Bankr.Cases 608 (M.D.Fla.1976); *In re Arden*, 2 Bankr.Ct.Dec. 204 (D.R.I.1975); *Cash Finance Service, Inc. v. Haisch*, 173 So.2d 851 (La.App.1965)). (Certiorari was denied by the Supreme Court in *Garman sub nom. Garman v. Northern Trust Co.*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981)).

The United States Court of Appeals for the Seventh Circuit made clear in *Garman*, however, that the judicial gloss on section 17(a)(2) had its limits:

Although some of the mentioned cases do, in fact, refer to "reasonable" or justifiable reliance as a requirement under § 17(a)(2), they do not require the court, as was done in the present case, to undertake a subjective evaluation and judgment of a creditor's lending policy and practices. These cases simply stand for the proposition that reasonableness is circumstantial evidence of actual reliance; that is, dischargeability shall not be de-

nied where a creditor's claimed "reliance" on a "financial statement" would be *so* unreasonable as not to be actual reliance at all. The opinions relied upon either state this directly, *e.g., Smith,* and *see Adams* and *Sweet,* or the lack of actual reliance was implicit in the record. In *Arden, for example,* the court held that the creditor knew the alleged misrepresentation was false at the time the loan was made and therefore could not have "reasonably" relied on the "misrepresentation." The court's decision to allow discharge, furthermore, was based upon its holding that the creditor had failed to prove the debtor's intent to defraud. In *Sweet,* one debtor, the husband, could neither read nor write except to sign his name on the statement filled out and signed by his wife. The entire transaction was completed in "no more than two minutes" and the creditor, although charging 30% interest on a portion of the amounts lent, never asked any questions concerning the listed assets or liabilities. The court noted the creditor was simply "taking advantage of a borrower's ignorance" and held that indications that the creditor was well aware of the unsound financial condition of the debtor yet exercised an "almost studied disregard for the truth ... is enough in many instances to preclude a later claim by the loan company that its reliance on the false financial statement was reasonable." 263 F.Supp., at 542. In *Kentile Floors,* and *Disbrow,* as in *Sweet,* the creditor possessed information that conflicted with the apparent financial well-being portrayed on the debtor's financial statement. In *Cash Finance,* the statement was all but illegible and the court found that it was "obvious" that the list of debts in the statement was incomplete. In *Ducote,* the money was transferred to the debtor at the same time the first financial statement was submitted, thus indicating that "the loan had already been approved when [the debtor] filed the signed financial statement." 4 Bankr.Ct.Dec. at 944. *See also Gibbs* and *Sweet, supra.* In *Smith* and *Gibbs,*

the debtor was a total stranger to the lender and the "financial statement," which was "nothing more than [a] typewritten statement on the stationery of the compan[y] whose financial status they purport[ed] to represent," *id.* at 862, was unsigned by the debtor. In *Carini,* this court simply stated, "And of course such reliance must be reasonable" while affirming the district court's finding of reasonable reliance. 592 F.2d at 381.

*Garman,* 643 F.2d at 1256 (emphasis and alterations in original); *see also, e.g., Swint v. Robins Federal Credit Union,* 415 F.2d 179 (5th Cir.1969) (no reliance on financial statement because loan manager knew that debtor had failed to list two substantial debts).

*Garman* concerned a debtor who had given the creditor bank three financial statements that, together, omitted approximately $50,000.00 in "claims" listed by the debtor in his bankruptcy petition. If listed, these potential liabilities would have reflected a significantly reduced net worth. When Garman filed his bankruptcy petition, the bank brought a complaint seeking to have Garman's debt held nondischargeable. The bankruptcy court held, however, that the debt was dischargeable because the bank had not reasonably relied on the financial statements. The district court affirmed.

Reversing the judgment of the district court, the Seventh Circuit observed that both the bankruptcy court and the district court mistook the meaning of reasonable reliance. They "did not address whether the [bank's] reliance *on the statements* was reasonable. Rather, they expressed their judgment on whether the decision *to loan Garman the money* was reasonable." *Garman,* 643 F.2d at 1257 (emphasis in original; footnotes omitted). The proper inquiry, the court concluded, was not whether the court agreed with the extension of credit as a business decision. *Id.* at 1258. Rather, courts should inquire whether creditors have relied on a "materially false financial statement containing infor-

mation apparently sufficient to obtain an accurate picture of the debtor's financial condition with regard to a reasonable decisional factor in the loan decision." *Id.*[8] Because the bank in *Garman* had relied on such a statement, the disputed debt was held nondischargeable.

## B. Reasonable Reliance Under the 1978 Bankruptcy Reform Act

The Seventh Circuit in *Garman* left open the question whether the construction of reasonable reliance under section 17(a)(2) applies in the same way under section 523(a)(2)(B)(iii). *See* 643 F.2d at 1256 n. 6.[9] This Court concludes that, if the construction of reasonable reliance in *Garman* is not wholly applicable,[10] it correctly suggests that the concept is not amenable to unrestricted application.

Congress clearly intended that section 523(a)(2)(B)(iii) codify prior case law interpreting section 17(a)(2). "[T]he creditor must not only have relied on a false statement in writing, the reliance must have been reasonable. This codifies case law construing present [section 17(a)(2)]." H.R.Rep. No. 595, 95th Cong., 1st Sess. 364, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6320; S.Rep. No. 989, 95th Cong., 2d Sess. 78, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5864; *see also* H.R.Rep. No. 595, *supra* at 130, *reprinted in* 1978 U.S.Code Cong. & Ad. News at 6091 (section 17(a)(2), referred to as "current law," did not explicitly require

8. A more complete excerpt from the Seventh Circuit's opinion follows:

[The bankruptcy court and the district court] did not hold that the financial statements showing Garman's net worth in excess of the loaned amount was inherently unreliable; rather, they were concerned by the fact that the Northern would have based its decision to lend money on the net worth and nature of the assets of the debtor rather than the debtor's income. However, it is not the court's duty under § 17(a)(2) to second guess a creditor's decision to make a loan or to set loan policy for the creditor. If a lender chooses to let net worth rather than income be the determinative factor in loan decisions, it is not for the court to say that this is bad business policy requiring discharge of the resulting debt in bankruptcy. The present issue for the court is simply whether the bankrupt obtained credit, or a renewal, through the creditor's reliance on a materially false financial statement containing information apparently sufficient to obtain an accurate picture of the debtor's financial condition with regard to a reasonable decisional factor in the loan decision, filed by the debtor with the intent to deceive the creditor. The creditor need establish only its reliance in fact, although its claims to reliance cannot be so unreasonable as to defeat a finding of reliance in fact. Given this reliance, the court, with the benefit of hindsight, should not base its decision regarding discharge on whether *it* would have extended the loan. In the present case, the [creditor]'s financial statement form requested sufficient information to obtain an accurate picture of the debtor's net worth, a reasonable decisional factor in the loan decision. To say the [creditor] should have looked to Garman's income flow instead of net worth is irrelevant to the § 17(a)(2) issues.

643 F.2d at 1257–58 (emphasis in original; footnote omitted).

9. The proceedings in *Garman* began before the effective date of the new provision. *But see In re Kreps,* 700 F.2d 372 (7th Cir.1983) (suggesting that the interpretation of reasonable reliance in *Garman* is applicable under the newer statutory provision of the Bankruptcy Code).

10. The court in *Garman* read the reasonableness-of-reliance cases as merely discussing a subset of the element of reliance. *See* 643 F.2d at 1256 ("These cases simply stand for the proposition that reasonableness is circumstantial evidence of reliance; that is, dischargeability shall not be denied where a creditor's claimed reliance on a financial statement would be *so* unreasonable as not to be actual reliance at all.") (emphasis in original). Cases decided under the Bankruptcy Code have suggested that there are two analytically distinct elements involved—actual reliance and reasonable reliance. *See, e.g., In re Kreps,* 700 F.2d 372 (7th Cir.1983) (reversing district court decision, which had affirmed bankruptcy court's finding that creditor had not actually relied on false statement). In any event, there can be little doubt that the Bankruptcy Court based its decision on Sovran's lack of reasonable reliance. *See supra* notes 6 & 7.

For purposes of clarification, the October 29, 1985, written order of the Bankruptcy Court inadvertently refers to 11 U.S.C. section 523(a)(2)(A) even though the order rests its holding of dischargeability on Sovran's failure to show that it reasonably relied on the materially false financial statement. That finding only makes sense under 11 U.S.C. section 523(a)(2)(B). The Bankruptcy Court's oral decision also discusses and rests it conclusions on section 523(a)(2)(B).

reasonable reliance, but courts had begun to require it).

Because section 523(a)(2)(B)(iii) codifies the judicial gloss placed on section 17(a)(2), older cases such as *Banks v. Siegel*, 181 F.2d 309 (4th Cir.1950), do not fully answer the question of what reliance is reasonable. *See In re Smith*, 2 B.R. 276, 279–80 (Bankr.E.D.Va.1980). To determine the meaning of reasonable reliance, therefore, the court must seek guidance both from the case law that has discussed the element and from the legislative history of the Bankruptcy Code.

Some courts, such as the Bankruptcy Court below, would impose on creditors an affirmative duty to investigate a debtor's financial condition in order for creditors' reliance to be reasonable. The leading case imposing such a duty is *Matter of Breen*, 13 B.R. 965 (Bankr.S.D. Ohio 1981). *Breen* concerned the dischargeability of a debt obtained after the debtor had submitted a financial statement omitting a mortgage on certain real property. In rejecting the creditor's challenge to dischargeability, the bankruptcy court held that the creditor's reliance was unreasonable because it could have discovered the mortgage by conducting a title examination or by telephoning the financial institution that held the mortgage and which was listed on the financial sheet as the holder of another mortgage. *See* 13 B.R. at 969; *see also In re Duncan*, 35 B.R. 323 (Bankr.W.D.Ky.1983) (bank's challenge to dischargeability of debt rejected because, among other reasons, bank had "ignored its commercial duty to verify ... information [on the financial statement]"); *cf. Matter of Shepherd*, 13 B.R. 367 (Bankr.S.D. Ohio 1981) (creditor showed a "lack of due care" by failing to demand certificate of title to truck, which was supposed to secure debtor's loans, and debt therefore not excepted from discharge under section 523(a)(2)(A) as a false representation when in fact debtor did not own truck title).

The problem with cases placing a duty of verification on creditors is that the duty appears to derive not from congressional intent but rather from judicial revision. The courts in these cases typically use the indefiniteness of the term "reasonably relied" as a point of departure. *See, e.g., Breen*, 13 B.R. at 968–69. Broad inferences from legislative history then follow. "The history of statutory and case law clearly indicate[s] the need for protection of naive and inexperienced bankrupts from the actions of creditors more sophisticated and knowledgeable (and at times unscrupulous)." *Id.* at 968. The bankruptcy court offered no citation of authority for this pronouncement.

Upon such a frail lattice the trends have been growing. Significantly, moreover, this trend has sprouted only recently. *Breen* is a 1981 case, and it espouses a theory without roots in prior law.[11] The

---

11. Two cases decided under section 17(a)(2) in effect reach the same result as that reached in *Breen. See In re Ducote*, 4 Bankr.Ct.Dec. 943 (Bankr.W.D.La.1978); *Matter of Hodges*, 6 Collier Bankr.Cas. 65 (Bankr.S.D.Fla.1975). In *Ducote*, the bankruptcy court dismissed the creditor's complaint because, among other reasons, the creditor did not investigate facts available to it. *See* 4 Bankr.Ct.Dec. at 945. The court cited no cases in reaching its conclusion, and its decision appears to be an expanded interpretation of section 17(a)(2). In any event, the case was decided on August 21, 1978, which is after the publication of the House and Senate Reports indicating congressional intent to codify the judicial gloss on section 17(a)(2) requiring reasonable reliance. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 364, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6320; S.Rep. No. 989,

95th Cong., 2d Sess. 78, *reprinted in* 1978 U.S. Code Cong. & Ad.News 5787, 5864.

*Hodges*, on the other hand, could have conceivably been included in the cases that Congress meant to codify because the case was decided in 1975. The bankruptcy court in *Hodges* also rejected a creditor's challenge to the dischargeability of a debt, and it did so on the basis that the creditor had not searched public records for encumbrances. *See* 6 Collier Bankr. Cas. at 68. Nevertheless, the decision in *Hodges* is based on Florida law that does not concern the dischargeability of a debt in bankruptcy, but rather on standards governing debtor-creditor relations in general. The decision ignores bankruptcy precedent, and thus should be considered a departure from the prevailing interpretation of section 17(a)(2). The conclusion that *Hodges* is an unprecedented decision is supported by the Seventh Circuit's critique of section 17(a)(2)

cases codified by section 523(a)(2)(B)(iii), by contrast, are more limited in effect. Generally, these cases involve three situations in which a creditor's reliance would be held unreasonable. First, reliance would be considered unreasonable if the creditor knew that the information on the financial statement was false. *See, e.g., Swint v. Robins Federal Credit Union*, 415 F.2d 179 (5th Cir.1969) (creditor knew debtor had omitted two substantial debts from financial statement). Second, reliance would be held unreasonable if the statement did not contain sufficient information to realistically portray the debtor's financial status. *See, e.g., In re Adams*, 368 F.Supp. 80 (D.S.D.1973) (form contained only blanks for creditors' names and amounts of debts; no procedure "for the recording of assets, a statement of monthly payments, or a credit report"). Third, reliance would be deemed unreasonable if, before extending credit, the creditor became aware of some information inconsistent with the accuracy of the financial statement. *See, e.g., Kentile Floors, Inc. v. Winham*, 440 F.2d 1128 (9th Cir.1971) (creditor's knowledge of debtor's increasing difficulty in making payments and of commercial failures was inconsistent with the information given on the financial statement).

These cases, which were settled law before the enactment of the Bankruptcy Code, are cases clearly codified in the reasonableness-of-reliance component of section 523(a)(2)(B)(iii). Not so clear is that cases such as *Breen* imposing some form of a duty to verify financial information also are part of section 523. Although not proposing as rigorous a duty of verification as was proposed in *Breen*, the United States Court of Appeals for the Sixth Circuit has nevertheless perceived some support in legislative history for a verification requirement. *See In re Martin*, 761 F.2d 1163, 1166 (6th Cir.1985). As the court in *Martin* stated,

The reasonableness requirement was intended to incorporate prior case law into the current Bankruptcy Act [i.e., the Bankruptcy Code], S.Rep. No. 989, 95th Cong., 2d Sess. 78, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5864; H.R.Rep. No. 595, 95th Cong., 1st Sess. 364 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6320. As such, it cannot be said to be a rigorous requirement, but rather is directed at creditors acting in bad faith. *See In re Garman*, 643 F.2d 1252, 1256 (7th Cir.1980) (holding that reasonableness is circumstantial evidence of actual reliance), *cert. denied*, 450 U.S. 910 [101 S.Ct. 1347, 67 L.Ed.2d 333] ... (1981). Congress was, however, concerned that creditors use, when feasible, "other sources of information, such as credit bureau reports, to verify the accuracy of the list of debts." H.R.Rep. No. 595, *supra*, at 130, *reprinted in* 1978 U.S.Code Cong. & Ad.News at 6091.

761 F.2d at 1166.[12]

A more complete excerpt from the same piece of legislative history relied on by the court in *Martin* establishes that Congress did not intend to add a verification requirement to section 523(a)(2)(B)(iii). The excerpt follows:

It is a frequent practice for consumer finance companies to take a list from each loan applicant of other loans or debts that the applicant has outstanding. While the consumer finance companies use these statements in evaluating the credit risk, very often the statements are used as a basis for a false financial statement exception to discharge. The forms that the applicant fills out often have too

case law in *Garman, see supra* Part III.A., and by the decision of the United States District Court for the Middle District of Louisiana in *In re Smith*, 424 F.Supp. 858, 861–62 (M.D.La.1976) (reviewing section 17(a)(2) case law and rejecting notion that creditor has duty to investigate).

**12.** The Sixth Circuit concluded, not surprisingly, that courts had to determine "reasonableness considering all the facts and circumstances of the case, including the size of the loan." 761 F.2d at 1166. Because the loan was small ($2,500.00), the bank had had prior dealings with the debtors, and the bank had obtained a credit report, its reliance was reasonable. *See id.* at 1166–67.

little space for a complete list of debts. Frequently, a loan applicant is instructed by a loan officer to list only a few or only the most important of his debts. Then, at the bottom of the form, the phrase, "I have no other debts" is either printed on the form, or the applicant is instructed to write the phrase in his own handwriting. In addition, the form states that the creditor has relied on the statement in granting the loan.

However, the creditor often has other sources of information, such as credit bureau reports, to verify the accuracy of the list of debts. Nevertheless, if the debtor files bankruptcy, creditors with these financial statements are in a position to threaten the debtor with litgation [sic] to determine the dischargeability of the debt, based on the false financial statement exception to discharge. Most often, there has been no intent to deceive on the part of the debtor, and, as in so many aspects of the creditor-debtor relationship, the debtor has simply followed the creditor's instructions with little understanding of the consequences of his action.

Creditor practices in this area have been so strong that the Bankruptcy Commission recommended that the false financial statement exception to discharge be eliminated for consumer debts. This bill recognizes, however, that there are actual instances of consumer fraud, and that creditors should be protected from fradulent debtors. It retains the exception, with small modifications. But it also recognizes that the leverage creditors have over their debtors comes not so much at the stage when the loan application is made, but rather when bankruptcy ensues.

The threat of litigation over this exception to discharge and its attendant costs are often enough to induce the debtor to settle for a reduced sum, in order to avoid the costs of litigation. Thus, creditors with marginal cases are usually able to have at least part of their claim excepted from discharge (or reaffirmed), even though the merits of the case are weak. Statistics from a recent year, for example, show that approximately 8,000 cases were filed under this exception to discharge. Of those, over 5,000 were settled without trial. Of the remaining 3,000, creditors won just half. If those 3,000 are representative, then it is likely that in 2,500 cases, debtors settled by agreeing to repay part of the debt, even though they would have won the case had it gone to trial.

In order to balance the scales more fairly in this area, H.R. 8200 adopts a compromise. The false financial statement exception is retained, and the creditor, as under current law, is required to initiate the proceeding to determine if the debt is nondischargeable. If the debtor prevails, however, the creditor is taxed costs and attorney's fees, and may be taxed any actual pecuniary damages, such as loss of a day's work, that the debtor might have suffered as a result of the litigation. The present pressure on the honest debtor to settle in order to avoid attorney's fees in litigation over a creditor—induced false statement is eliminated. The creditor is protected from dishonest debtors by the continuance of the exception to discharge.

The bill does not award the creditor attorney's fees if the creditor prevails. Though such a balance might seem fair at first blush, such a provision would restore the balance back in favor of the creditor by inducing debtors to settle no matter what the merits of their cases. In addition, the creditor is generally better able to bear the costs of the litigation than a bankrupt debtor, and it is likely that a creditor's attorneys fees would be substantially higher than a debtor's, putting an additional disincentive on the debtor to litigate.

The costs-attorney's fees provision is mandatory. If the provision were made permissive instead of mandatory, with discretion in the court to award such amounts as were proper in each particular case, the debtor would once again be subject to the risk of paying attorney's

fees and losing a day's work without pay. The balance would again shift back toward the creditor, and would put pressure on the debtor to settle. Making the provision discretionary would seriously weaken the protection it provides.

H.R.Rep. No. 595, 95th Cong., 2d Sess. 130–32, *reprinted in* 1978 U.S.Code Cong. & Ad.News 6091–93 (footnotes omitted).

The Sixth Circuit interpreted the reference to the availability of credit bureau reports as reflecting a concern by Congress that creditors use such reports. Placed in context, however, the reference has less significance. The concluding sentences of the paragraph preceding the reference to credit reports explain the ways that creditors establish indicia of reliance on a statement. "However," the transition to the next paragraph begins, "the creditor often has other sources of information, such as credit bureau reports, to verify the accuracy of the list of debts." In other words, a creditor really does not need to rely on the financial statement, and allowing the creditor to build indicia of reliance only strengthens its hand in forcing unfair settlements. Thus, the passage continues, a movement developed to eliminate the false financial statement exception to discharge with regard to consumer debts. The result was a compromise. Leaving the false financial statement exception to discharge intact in order to protect creditors from fraud, Congress in turn sought to protect debtors from unfair settlement pressure by giving prevailing debtors the right to attorney's fees and costs, as well as actual pecuniary damages. The terms of the compromise do not, however, involve the addition of an independent verification requirement to the reasonableness-of-reliance standard of section 523(a)(2)(B)(iii), even though Congress knew that such verifica-

tion techniques are available. In any event, the creation of a verification requirement from a passing reference taken out of context is unwarranted.

This Court must conclude, therefore, that Congress did not intend to include a verification requirement when it enacted section 523(a)(2)(B)(iii) of the Bankruptcy Code. Case law construing section 17(a)(2) had not gone so far, and the legislative history of the Bankruptcy Code suggests that the area in which debtors gained added protection was the availability of attorney's fees, costs, and pecuniary damages. "Where the financial statement is not facially incomplete or inaccurate," as one bankruptcy court put it, "then there is no obligation upon a creditor to make an independent check, unless the creditor's normal business practice dictates that such checks be made in all instances." *In re Mutschler*, 45 B.R. 482, 493 (Bankr.D.N.D.1984) (citing *In re Vairo*, 40 B.R. 776, 781 (Bankr.S.D. N.Y.1984)); *see also In re Harms*, 53 B.R. 134, 141 n. 3 (Bankr.D.Minn.1985) ("[The approach espoused in *Breen* ] would appear to impose the duty of independent verification of entries on a financial statement on the creditor regardless of whether the creditor had cause to suspect them false or not. The Court has reservations whether the Bankruptcy Code can be construed to impose such a burden where individual or industry practice do [sic] not already require it."); *In re Anderson*, 29 B.R. 184, 194 n. 8 (Bankr.N.D.Iowa 1983) (declining to follow *Breen* ).[13]

That is not to say, however, that the content of the reasonableness-of-reliance requirement is static. Interpretation of the requirement that is consistent with the interpretation used in the section 17(a)(2) cases, codified in section 523(a)(2)(B)(iii),

---

**13.** Imposing a *per se* verification duty could well place creditors in the position of having to make a Hobson's choice: they could either thoroughly verify financial statements and thereby undercut their reliance on the statements or, conversely, do minimal verification in order to preserve reliance and yet run afoul of the verification duty. *See, e.g., In re Furimsky*, 40 B.R.

350, 355 (Bankr.D.Ariz.1984) ("Plaintiff [creditor] has a mandatory policy requiring loan officers to verify every credit application by, *inter alia* a credit reporting service.... There are no exceptions to this requirement.... Such a rule is good banking policy but severely undercuts claims the institution 'relies' on submitted financial statements.").

would certainly be appropriate.[14] As suggested in the above quotes from *Mutschler* and *Harms,* furthermore, the practices of a particular lending institution and the custom of the lending industry bear on the reasonableness of a creditor's reliance. As opposed to a *per se* verification standard such as that announced in *Breen,* the inquiry into business practices and customs hinges necessarily on the circumstances of a given case. In the seminal decision on this question, the United States District Court for the District of Maryland concluded that the creditor's reliance on a financial statement should be determined "by comparing the creditor's actual conduct with (1) the creditor's own normal business practices, and (2) the standards and custom of the industry, (3) in light of the surrounding circumstances existing at the time the application was made and credit extended." *Matter of Patch,* 24 B.R. 563, 567 (D.Md. 1982).

■ This Court recognizes the appropriateness of the business-practices-and-industry-custom inquiry.[15] The inquiry does not mandate a finding of unreasonable reliance if a creditor fails to investigate certain facts about a debtor's creditworthiness. If

the creditor's business practices required a certain degree of verification, or if industry custom did so, then departure from practices or custom *could* lead to a finding of unreasonable reliance. As suggested in subpart (3) of the inquiry outlined in *Patch* —consideration of "the surrounding circumstances existing at the time the application was made and credit extended"—departure from business practices or industry custom would not necessarily mean that a creditor exhibited unreasonable reliance. A departure could have been justified in the circumstances, and the creditor's reliance could still be reasonable. The key characteristic of the business practices and industry custom inquiry is, therefore, that reliance is measured not against a *per se* verification standard, but rather against standards as they are developed factually in a given set of circumstances.[16]

### C. Application of the Reasonableness-of-Reliance Standard

#### 1. *Original Loans*

■ The Bankruptcy Court found that Sovran unreasonably relied on Mr. Allen's[17] financial statement because the

---

**14.** For instance, the following decisions are consistent with the section 17(a)(2) case law codified under section 523(a)(2)(B)(iii): *In re Houk,* 17 B.R. 192 (Bankr.D.S.D.1982) (reliance unreasonable because creditor had actual knowledge of judgments and liens not listed on the debtor's financial statement); *In re Magnusson,* 14 B.R. 662 (Bankr. N.D.N.Y.1981) (reliance unreasonable because financial statement did not contain sufficient information to realistically portray the debtor's financial status); *In re Smith,* 2 B.R. 276 (Bankr.E.D.Va.1980) (reliance unreasonable because creditor acquired knowledge, before granting a loan, inconsistent with the information on the financial statement).

**15.** The court in *Patch* offered persuasive reasons for application of the business-practices-and-industry-custom inquiry:

An examination of the creditor's normal business practices is important for several reasons. For example, the creditor's failure to follow its own practices may be evidence of unreasonable conduct. Further, evidence of a creditor's normal practices would shed light on the character of its operation and allow for a comparison with industry standards.

The customs and practices of the industry should be examined because commercial lending practices are not static. As economic and social changes occur, the industry can be expected to act in a manner that will protect the financial integrity of its operations. As the false statement exception to discharge is of national application, the peculiar practices of a particular creditor cannot be the sole benchmark for assessing the reasonableness of its reliance. In other words, a creditor cannot disregard industry custom and be held to have acted reasonably, if the following of standard practices would have provided the creditor with important information.
24 B.R. at 567–68.

**16.** The inquiry outlined in *Patch* appears to be one with conjunctive elements, and this Court considers a conjunctive inquiry to be the proper one. In determining reasonableness of a creditor's reliance, therefore, evidence should be developed and findings made on each subpart outlined in *Patch.*

**17.** Mrs. Allen did not sign the statement, and for that reason the Bankruptcy Court dismissed the complaint as to her. This Court agrees with the

bank had failed to verify the accuracy of the statement. A *per se* duty of verification does not exist under section 523(a)(2)(B)(iii), and the Bankruptcy Court lacked the evidence necessary to measure Sovran's conduct against its own practices and industry custom. As a question of the proper application of legal standards, clearly erroneous review is inapplicable. *See supra* cases cited in Part II; *see also Matter of Garman*, 625 F.2d 755, 763 (7th Cir.1980), *cert. denied sub nom. Garman v. Northern Trust Co.*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981); *In re Fett Roofing & Sheet Metal Co., Inc.*, 438 F.Supp. 726, 729 (E.D.Va.1977), *aff'd*, 605 F.2d 1201 (4th Cir.1979).

■ Evidence admitted below concerned, at least in part, Sovran's business practices. The Bankruptcy Court, however, made no findings on whether and to what extent Sovran had departed from its own practices. Furthermore, no evidence was admitted concerning industry custom. Therefore, the Bankruptcy Court's conclusions on the proper method of extending credit [18] are without support. Section 523(a)(2)(B)(iii) is designed not to be a gauge of business acumen, but rather to provide some measure of whether a creditor has in good faith relied on a debtor's financial statement. That Sovran sought a retail credit check rather than a commercial one, for instance, thus does not establish unreasonable reliance. Before such a finding can be made, the Court must consider both Sovran's business practices and industry custom in light of the circumstances surrounding the extension of credit to the Allens.

dismissal. *Cf. Engler v. Van Steinburg*, 744 F.2d 1060 (4th Cir.1984) (statement has to be written).

**18.** See, for instance, the following statements of the Bankruptcy Court:

[S]omeone like Mr. Allen ought not get by with this, I would agree, to take in a statement like this and for it to be false as it is, but the lending institutions have just got to be more careful. They've just got to be more careful in the granting of credit.

### 2. *Effect of Consolidation*

A final point must be addressed. The reasonableness of Sovran's reliance on the financial statement, at the time that the loan was consolidated in June 1984, also has been put in issue. The Bankruptcy Court found that Sovran's reliance in June 1984 also was unreasonable because the bank had become aware by that time not only of the mortgages on the Allens' residence but also of their failing business. The Bankruptcy Court suggested that Sovran had no choice but to reduce its claim to judgment and to proceed to satisfy the judgment. Again, this Court cannot agree as a matter of law.

■ When a loan is made on the basis of a false financial statement and the loan is subsequently renewed or consolidated [19] under nonfraudulent conditions, the original amount extended on the basis of a false statement remains nondischargeable. *See In re Liming*, 22 B.R. 740, 742 (Bankr.W. D.Okla.1982); *see also In re Ardelean*, 28 B.R. 299 (Bankr.N.D.Ill.1983). Some bankruptcy courts have suggested otherwise. *See, e.g., In re Archangeli*, 6 B.R. 50 (Bankr.D.Me.1980). Cases such as *Archangeli*, however, mistakenly interpret the effect of section 523(a)(2)(B).

*Archangeli* dealt with a situation similar to that before this Court. The debtor received a loan after submitting a false financial statement, and the loan was subsequently consolidated with other previous loans. No further credit was extended at the time of consolidation, and another financial statement was not submitted. The bankruptcy court held the entire debt dischargeable because the bank had not relied

. . . . .

And the Court sees again and again that—and I can understand you're in business; the business is to put the money out, to loan. You can't stack it away in the vault and make any money on it. But really there ought to be a more thorough system of extending credit.

**19.** For purposes of this analysis, there can be little doubt that "consolidation" is the functional equivalent of a "renewal" or an "extension" for purposes of section 523(a)(2) analysis.

on the financial statement. *See* 6 B.R. at 52–53.

The decision in *Archangeli* rests on the assumption that the reasonable reliance on a false financial statement justifying a finding of nondischargeability can be wiped out by a subsequent consolidation of credit made under nonfraudulent conditions. More often, the effect of a subsequent loan renewal involves what is called the "fresh cash" situation: a loan is renewed with further credit—"fresh cash"—extended to the debtor. The extension of further credit in these cases has, however, been achieved under fraudulent circumstances. Typically, the debtor submits a false financial statement at the time of renewal. *See, e.g., In re Danns*, 558 F.2d 114 (2d Cir.1977); Townsend, *"Fresh Cash"—Another Element of a Bankrupt's "Fresh Start"?*, 31 U.Miami L.Rev. 275, 281–86 (1977) (discussing "fresh start" cases). Thus, the rationale goes, the nondischargeable amount is limited to the amount of credit actually extended in reliance on the false financial statement. Otherwise, a creditor could "increase the amount of debt that is excepted from discharge merely by requiring a new note covering the debt." Zaretsky, *The*

*Fraud Exception to Discharge Under the New Bankruptcy Code*, 53 Am.Bankr.L.J. 253, 266 (1979). *But see In re Carter*, 11 B.R. 992, 998 (Bankr.M.D.Tenn.1981) (holding that, "when a debtor obtains renewal of an existing debt by use of a false financial statement upon which the creditor reasonably relied, the measure of relief available to the defrauded creditor under § 523(a)(2)(B) is punitive—not compensatory—and the full amount of renewed debt is nondischargeable").

The rationale for the "fresh cash" doctrine therefore does not apply [20] when, as in the present appeal, the original loan rather than the renewal was made under fraudulent circumstances. As is stated in a key piece of legislative history to the Bankruptcy Reform Act of 1978,

A debt for obtaining money, property, or services, or an extension or renewal of credit by use of a statement in writing respecting the debtor's financial condition, that is materially false, that the debtor made or published with intent to deceive, and on which the creditor reasonably relied, is excepted from discharge under the bill. The amount of the debt made nondischargeable on ac-

---

**20.** By extension, any "fresh start" policy underlying the doctrine also does not apply. The decision in *Carter,* furthermore, casts doubts on the vitality of the "fresh start" policy in false financial statement cases. *See In re Carter,* 11 B.R. 992, (Bankr.M.D.Tenn.1981) ("In § 523(a)(2)(B), Congress has retained the last punitive sanction to be imposed upon dishonest debtors for the fraudulent use of false financial statements."); *see also Bruning v. United States,* 376 U.S. 358, 361, 84 S.Ct. 906, 908, 11 L.Ed.2d 772 (1964) ("[P]etitioner [is not] aided by the non-familiar principle that one main purpose of the Bankruptcy Act is to let the honest debtor begin his financial life anew. As the Court of Appeals noted, § 17 is not a compassionate section for debtors. Rather, it demonstrates congressional judgment that certain problems ... override the value of giving the debtor a wholly fresh start.") (footnote omitted); *In re Hunter,* 771 F.2d 1126, 1130 (8th Cir.1985) ("When dishonesty is demonstrated with respect to a specific debt, the debtor 'is no longer entitled to the benefit of debtor rehabilitation considerations.'") (quoting *In re Wilson,* 12 B.R. 363, 370 (Bankr.M.D.Tenn.1981)).

As the above cases recognize, explicitly or implicitly, Congress struck a compromise in

1960 by removing the false financial statement ground for objection to discharge as to all debts, and by retaining the ground as a means of having a specific debt held nondischargeable. *Compare* Act of July 12, 1960, Pub.L. No. 86–621, 74 Stat. 408 (removing false financial statement as ground for objection to discharge) *with* Act of July 12, 1960, Pub.L. No. 86–621, 74 Stat. 409 (retaining false representation as ground for objection to dischargeability of a specific debt and adding explicit reference to false financial statements). Congress more recently has considered attacks on the false financial statement objection to discharge, and has chosen to retain that ground for objection intact. *See supra* text accompanying notes 12–13. Judicial attempts to engraft a fresh start policy onto the false financial statement objection to discharge thus are properly viewed with skepticism. Because the policies underlying questions of dischargeability are sharply conflicting, decisions about the scope of the nondischargeability provisions are best left to Congress where legislative techniques and the safeguard of political accountability can ensure that the conflicting policies are resolved in a legitimate manner.

count of a false financial statement is not limited to "new value" extended when a loan is rolled over. If an initial loan is made subject to a false financial statement and new money is advanced under a subsequent loan that is not made under conditions of fraud or false pretenses, then only the initial amount of the loan made on the original financial statement is invalidated and excepted from discharge. On the other hand, where the original financial statement is made under nonfraudulent conditions and the entire loan in addition to new money is advanced under a subsequent false financial statement, the entire loan is made under fraudulent conditions. This rule is sound as a matter of policy because the creditor relies to his detriment with respect to the entire amount advanced under the false financial statement. Legal rights with respect to the amount previously advanced may be altered; interest rates may be changed, maturity dates may be extended, and legal remedies may be forgone in reliance on the new false financial statement. However, if the terms of the new agreement are identical to the old agreement with respect to the old money, then no new money was obtained by a false statement on which the creditor relied since the creditor's rights were unchanged; therefore, only that portion of the false financial statement that applied to new money would be nondischargeable....

H.R.Rep. No. 595, 95th Cong., 2d Sess. 130–32, *reprinted in* 1978 U.S.Code Cong. & Ad.News 6091–92 (footnote omitted); *see also* L. King, 3 Collier on Bankruptcy § 523.10 (1986) (stating same rule).

The above passage distinguishes between renewals under nonfraudulent conditions and those under fraudulent conditions. When a loan originally is obtained fraudulently and "fresh cash" is later extended as part of a renewal under non-

fraudulent conditions, the original debt remains nondischargeable. Conversely, the dischargeability of loans made originally under nonfraudulent conditions that are later renewed with fresh cash based on a false financial statement depends, apparently, on the terms of the renewal agreement. If the terms of the agreement are different from those originally agreed to, the entire debt is nondischargeable because the creditor has suffered detrimental reliance. If the terms of the agreement are identical to those of the original one, only the fresh cash is nondischargeable.[21]

This Court finds persuasive the guidance in the passage from House Report No. 595. The standard set forth in the passage concerning renewals under nonfraudulent conditions establishes that section 523(a)(2)(B) does not directly cover such factual situations. If the statute were meant to do so, the House Report would not indicate that an original debt could be held nondischargeable when renewed in nonfraudulent conditions. Rather, if section 523(a)(2)(B) were meant to apply even when a debt is renewed without fraud, then the legislative history should indicate that the debt is dischargeable. Reliance on a false statement is all but impossible when one knows it is false, and reliance is an essential element in establishing the nondischargeability of a debt. Section 523(a)(2)(B) therefore cannot have been intended to cover situations such as is presented on this appeal.

That House Report No. 595 discussed renewal agreements in the "fresh cash" context does not alter its import. The Court can see no justification for treating nonfraudulent renewals involving "fresh cash" differently from nonfraudulent consolidation agreements not involving "fresh cash." Concerning the original debt extended on the basis of a false financial statement, the result should be the same

21. For other legislative history suggesting that the "fresh cash" rule of *In re Danns*, 558 F.2d 114 (2d Cir.1977), has been codified, see 124 Cong.Rec. S17412 (daily ed., Oct. 6, 1978) (re-

marks of Sen. DeConcini); 124 Cong.Rec. H11096 (daily ed., Sept. 28, 1978) (remarks of Rep. Don Edwards).

regardless of "fresh cash": the debt should remain nondischargeable.[22]

## IV. CONCLUSION

For the reasons stated above, the decision of the Bankruptcy Court is reversed, and the case is remanded for further proceedings consistent with this opinion. On remand, further evidence should be taken and further findings made on the reasonableness of Sovran's reliance on the financial statement at the time of the original loans. The Bankruptcy Court should consider any evidence of the custom and practice of Sovran and other related banking institutions. The Bankruptcy Court also should decide the issue that it deferred at trial—whether Mr. Allen had the requisite intent to deceive when he submitted the false financial statement. As Mrs. Allen's right to a discharge is not in controversy as she did not sign the financial statement, her discharge is AFFIRMED.

REVERSED AND REMANDED

22. This conclusion assumes, of course, that all of the elements necessary to establish nondischargeability of the original debt have been satisfied.