**In re John R. SPICER, Debtor.**

**UNITED STATES of America, Plaintiff,**

v.

**John R. SPICER, Defendant.**

**Bankruptcy No. 92–00848.**
**Adv. No. 92–0250.**

United States Bankruptcy Court,
District of Columbia.

June 29, 1993.

As Corrected July 2, 1993.

Michael F. Hertz, Stephen D. Altman, David W. Long, Washington, DC, for plaintiff.

Ronald L. Schwartz, Silver Spring, MD, for defendant.

## DECISION REGARDING MOTION FOR SUMMARY JUDGMENT DECLARING DEBT TO THE UNITED STATES OF AMERICA NONDISCHARGEABLE

S. MARTIN TEEL, Jr., Bankruptcy Judge.

In this decision, the court holds nondischargeable under 11 U.S.C. § 523(a)(2)(A) the debtor's debt to the government under a settlement agreement which compromised government claims arising from the debtor's submitting false statements to obtain government mortgage insurance. In determining to grant summary judgment in favor of the government, the court rejects the debtor's contention (1) that the settlement was a novation, leaving only a contract debt which was discharged, (2) that the government may not rely on the settlement figure but must show the amount of damages caused by the debtor's admittedly false statements, and (3) that the debtor, who knowingly submitted the false statements for the purpose of obtaining the guarantees, lacked a specific intent to defraud.

### FACTS

At the outset it should be emphasized that the debtor does not contest that the settlement was based on his false statements to the government. In the record

presented that would be the only reasonable inference.

From 1983 through 1984, the debtor made numerous false statements to the government in order to obtain mortgage insurance from the government for the buyers of various real properties the debtor was trying to sell. These statements falsely represented that the buyers had made the downpayments required by law to participate in a federal mortgage insurance program. In reliance on the false statements, the Department of Housing and Urban Development ("HUD") approved mortgage insurance for the loans: the insurance would be authorized only if a review of the closing documents showed that the statutory requirement of at least a 3% down payment had been met. The debtor either owned the relevant properties by himself or in partnership, or he acted as broker for the owners of the properties receiving a commission for their sale. Of the 81 properties where the debtor made false statements to obtain mortgage insurance, the government has provided evidence that it had to settle claims on 41 of them. As a result, the government alleges, it sustained losses of over $1.8 million.

Because of his conduct, the debtor pled guilty in United States District Court for the District of Columbia to one count of interstate transportation of money obtained by fraud in violation of 18 U.S.C. § 2314. In a factual proffer and again orally at both the entry of the plea agreement and the sentencing hearing, the debtor admitted to making false statements and acknowledged that he did so to obtain mortgage insurance from the government. The false statements the debtor admitted making included not only those statements forming the substance of the one count of fraud to which he pled guilty but also false statements made in applying for mortgage insurance for 80 other properties. The district court accepted the debtor's guilty plea and sentenced him to 4 months in a community correctional center and ordered restitution of $340,000.00, the amount of the debtor's profits from the real property sales. The district court stated that it would be amenable to reducing the amount of resti-

tution if Spicer subsequently reached a civil settlement with the government.

The debtor and the government entered into a settlement agreement compromising all the government's civil claims against the debtor under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–33, and at common law. These claims were grounded in the debtor's role in submitting applications for federal mortgage insurance from 1980 through 1984. Specifically, the settlement agreement recited that the government "contend[s] ... that Spicer ... caused the submission to HUD of at least nine false applications for HUD mortgage insurance, and is liable for losses sustained in connection with claims for HUD mortgage insurance benefits submitted by [the] mortgage holders...." Govt. exh. 10, par. 3. Without admitting liability under the FCA or at common law, the debtor agreed to pay the government over a 10–year period $339,000.00 in principal plus interest 8.5% per annum on $100,000.00 of the $339,000.00 debt. The settlement agreement included a release whereby the government agreed it would have no further civil claim, other than tax claims, against Spicer arising out of the claims recited in paragraph 3 of the settlement agreement "or arising out of any other real estate sales transactions in the District of Columbia from 1980 through 1984 in which buyers financed their purchases with mortgages insured by HUD...." Govt. exh. 10, par. 6. Based on the settlement agreement, the district court vacated the restitution order.

The parties viewed the settlement agreement as fixing compensation for HUD's losses. In reaching the settlement agreement the parties focused on Spicer's financial circumstances. At first, subject to Department of Justice approval, HUD agreed that Spicer was to pay only $100,000, payable over a 10–year period in recognition of Spicer's "currently bleak financial situation" (Govt. exh. 8 at 3). In moving to vacate the restitution award, Spicer characterized the settlement agreement as "a global settlement of his civil liability for damages to HUD and the debarment/suspension proceeding initiated by HUD...."

*Id.* at 2. Further, Spicer stated that "HUD ... has agreed to accept the $100,000 ... as appropriate restitution." *Id.* at 4. Spicer viewed the $100,000 as a recovery of "compensatory damages." *Id.* at 4 n. 4 (quoting 18 U.S.C. § 3663(e)(2) (1985 and 1990 Supp.)). In response to a "concern that the settlement agreement did not adequately consider potential improvements in Mr. Spicer's financial situation in the future," Spicer then agreed to a Justice Department proposal to supplement the original proposal by $239,000. Govt. exh. 9 at 2. Spicer reported in the district court that he and the government "now believe that the sizeable civil settlement agreement that Mr. Spicer has agreed to pay satisfies the Court's interest in compensating HUD under the Restitution Order...." *Id.* at 3. Spicer explicitly believed that the district court had stated that it would be amenable to reducing the amount of restitution if Spicer reached a civil settlement with the government "with respect to any losses sustained by HUD in connection with its FHA guaranteed mortgages." *Id.* at 1.

On July 29, 1992, the debtor filed a petition for bankruptcy under chapter 7 of the Bankruptcy Code. On October 29, 1992, the government filed a complaint for a determination that under 11 U.S.C. § 523(a)(2)(A) the debt for $339,000.00 cannot be discharged in bankruptcy. Summary judgment motions were filed, first by the government on February 26, 1993, and then by the debtor on April 15, 1993.

## DISCUSSION

Section 523(a)(2)(A) provides:

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—

(2) for money, property, [or] services, ... to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

## I

■ At the outset, the court must reject the debtor's argument that its debt to the government is only a contract debt that can be discharged. Thus, the court rejects the holdings of *Maryland Casualty Co. v. Cushing,* 171 F.2d 257 (7th Cir.1948), and *Gonder v. Kelley,* 372 F.2d 94 (9th Cir. 1967) (affirming on the basis of the district court opinion), and their progeny in favor of the analysis set forth in *Greenberg v. Schools,* 711 F.2d 152 (11th Cir.1983) (affirming on the basis of the district court opinion), for the reasons articulated by the dissent in *Gonder v. Kelley,* 372 F.2d at 94–95 (Koelsch, J., dissenting). *See also Arnold v. Employers Ins. Co. of Wassau,* 465 F.2d 354 (10th Cir.1972); *Hartford Accident & Indem. Co. v. Flanagan,* 28 F.Supp. 415 (S.D.Ohio 1939).

Accordingly—

The fact that [the plaintiff's] claim never matured into a final judgment but was terminated by a settlement agreement should not be controlling. The Bankruptcy Court should inquire into the factual circumstances behind the settlement agreement to ascertain whether or not the debt incurred by [the debtor] was derived from the alleged fraudulent conduct [complained of]. If the court is satisfied that [the debtor's] conduct was fraudulent and did result in the debt that [the plaintiff] claims against him, the debt should not be discharged by the bankruptcy proceeding.

*Greenberg v. Schools,* 711 F.2d at 156.

## II

■ In opposing the government's motion (on the assumption that *Greenberg v. Schools* is controlling), the debtor argues that to establish nondischargeability the government must demonstrate that the debtor's fraudulent conduct caused it to suffer damages in the amount of the settlement debt, $339,000.00.

In making this argument, the debtor misperceives the nature of the court's inquiry. In examining the underlying conduct, the court must satisfy itself that the conduct complained of in fact amounted to fraud by the debtor within the meaning of § 523(a)(2)(A). Having satisfied itself that this is the case, the court must then exam-

ine the debt established by the settlement agreement ("the settlement debt") to determine to what extent it was intended to be a substitute for any underlying claim for fraud against the debtor. To the extent the settlement debt was attributable to the debtor's fraudulent conduct, it cannot be discharged in bankruptcy, but to the extent the settlement debt was intended to compromise other claims against the debtor, it can be discharged.

 In this case all of the settlement debt was based on the debtor's knowingly making false claims to obtain government mortgage insurance: it related only to claims for that fraud. Having satisfied itself that the settlement debt was intended to compromise only fraudulent conduct, the court's inquiry is at an end. For the settlement debt attributable to the debtor's fraud falls within the language of § 523(a)(2)(A). First, it is a "debt" as defined in the Code. 11 U.S.C. § 101(12) (debt means "liability on a claim"). Second, the settlement debt is "for money, property, [or] services, ... to the extent obtained by [fraudulent conduct]" in that it resulted from the debtor's fraudulent conduct in obtaining mortgage insurance from the government. *See Hartford Accident & Indem. Co.*, 28 F.Supp. at 419. A fraudulently obtained loan guarantee is "property" for the purposes of § 523(a)(2). *In re Sprague*, 104 B.R. 352, 355 (Bankr.D.Or. 1989); *In re McShirley*, 79 B.R. 71, 73 (Bankr.M.D.Fla.1987); *In re Kovacs*, 42 B.R. 1, 3 (Bankr.D.Mass.1982).

 The debtor urges that the evidence does not support liability under the FCA for the amount of the debt, citing, for example, *United States v. Hibbs*, 568 F.2d 347, 351 (3d Cir.1977) (government could not recover under FCA for loss attributable to events not caused by or related to the false certifications), and *United States v. Miller*, 645 F.2d 473 (5th Cir.1981) (government must show that false certifications were the primary cause of the defaults). *See also United States v. Hill*, 676 F.Supp. 1158 (N.D.Fla.1987) (reaching similar conclusion with respect to FCA as amended in 1986). Other courts impose a lower stan-

dard of causation. *United States v. First Nat'l Bank of Cicero*, 957 F.2d 1362, 1374 (7th Cir.1992) (government must show that it would not have guaranteed loans but for false statements). The debtor's argument, even if the cases he cites were correctly decided, is irrelevant: this is not a proceeding on a FCA claim. It is a proceeding on a settlement fixing the amount recoverable by the government based on admittedly fraudulent conduct. As discussed above, that settlement debt is of the requisite character to escape dischargeability under § 523(a)(2)(A).

The parties settled the underlying claim for fraud for an agreed upon amount. The parties arrived at a mutually acceptable resolution of the underlying claim, and the court ought not step in now and nullify their efforts unless giving effect to the settlement agreement is somehow inconsistent with § 523. Having agreed to the settlement and having benefitted accordingly, the debtor should be bound by the settlement amount—at least to the extent it represents a compromise of the claims arising from his fraudulent conduct.

With this analysis in mind, those cases going behind the settlement agreement to determine how much of the settlement debt is nondischargeable can be squared with other cases where no such inquiry was made. Thus, *In re Carnahan*, 115 B.R. 697 (Bankr.D.Colo.1990), and *In re Bobofchak*, 101 B.R. 465 (Bankr.E.D.Va.1989), both were cases where the settlement debt included amounts attributable to claims other than those giving rise to nondischargeable debts. In these cases, the courts went behind the settlement agreement to determine how much of the settlement debt was nondischargeable.

Similarly, *In re Church*, 69 B.R. 425 (Bankr.N.D.Tex.1987), involved a debt arising from a judgment obtained in state court. The state court judgment broke the damages down into their component parts. Because the bankruptcy court determined that certain parts of the damages as listed and described were dischargeable, it declared nondischargeable only those amounts the judgment stated had arisen

from the debtor's fraud. *Church*, 69 B.R. at 434–35.

In another case cited by the debtor, *In re Arterburn*, 15 B.R. 189 (Bankr. W.D.Okla.1981), the issue involved was whether the settlement agreement had been fraudulently induced, and not whether the settlement debt compromised claims for fraud against the debtor. *See also In re Schmidt*, 70 B.R. 634, 645 (Bankr.N.D.Ind. 1986) (noting this distinction on similar facts).

However, no inquiry behind the settlement agreement was made in *In re Guerrerio*, 143 B.R. 605 (Bankr.S.D.N.Y.1992), or in *In re Rush*, 33 B.R. 97 (Bankr.D.Me. 1983). In those cases the settlement agreements resolved suits for fraud against the debtor and no other claims. *Cf. In re Marceca*, 129 B.R. 371 (Bankr.S.D.N.Y. 1991) (settlement of misappropriation claim); *Hartford Accident & Indem. Co. v. Flanagan, supra* (debt owed under contract of indemnity but resulting from embezzlement).

Moreover, in those cases discussed above where the courts did seek to apportion the settlement debt between nondischargeable and dischargeable amounts, the courts did not examine whether the debtor's conduct in fact caused the plaintiff creditor to suffer losses in the amount of the settlement debt. Instead, the courts—without visiting the issue of causation—sought only to determine what part of the debt was intended to compromise the claims for fraud or the like and what part was intended to settle other claims against the debtor.

■ The whole tenor of Spicer's settlement negotiations with the government was to fix losses to be repaid by Spicer in order that he might secure a vacating of the restitution award against him. There is no suggestion that punitive damages specifically came into consideration. Nevertheless, this case may be distinguishable from such cases as *Guerrerio*, 143 B.R. at 610–611 and *Rush*, 33 B.R. at 97, because the specific arguments the debtors raised in those cases did not question whether the settlement agreements were for losses attributable to the unquestionable fraud involved. Here the debtor raises that issue and it is theoretically possible that the debtor faced punitive damage claims, not only damage claims for losses caused by the debtor's fraud.

Can the $339,000 settlement amount be viewed as simply fixing the amount of losses HUD suffered? Certainly it could as to the $100,000 component that the debtor himself urged—before the settlement was increased to $393,000—was compensation for losses. The court assumes, without deciding, that the remaining $239,000 could be viewed as for punitive damages as well as for compensatory damages.

Although *Church*, 69 B.R. at 434–35, and other decisions have held that punitive damages are dischargeable under 11 U.S.C. § 523(a)(2)(A), the contrary holding of *In re St. Laurent*, 991 F.2d 672 (11th Cir.1993), was reached on more persuasive grounds and I hold that punitive damages are part of the debt for property, mortgage insurance, that in its entirety, was obtained by actual fraud.

The settlement agreement states on its face that it compromised the government's claims stemming from the debtor's submission of false information to the government. The debtor's conduct gave rise to claims against the debtor under the FCA and for fraud at common law. Neither party has alleged that the government had any other basis for claims against the debtor. The debtor has pointed to no component of the settlement agreement that could be for other than compensatory damages caused by the false statements or punitive damages. The settlement debt is wholly attributable to the common law claims for fraud and FCA claims founded on knowingly false statements.

### III

■ There remains for determination whether the underlying conduct complained of by the government amounted to fraud within the meaning of § 523(a)(2)(A). The elements of a § 523(a)(2)(A) exception to discharge have been stated to be:

1. The obtaining of money, property, [or] services ...,

2. Using a false representation pertaining to a past or present fact,

3. With knowledge of the representation's falsity, or its assertion as fact with reckless disregard for its truth or falsity,

4. And an intention to deceive the other party or to induce the other party to act upon the representation,

5. Reasonable reliance by the creditor upon the misrepresentation, and

6. Resultant detriment to the creditor.

*In re Hames,* 53 B.R. 868, 871 (Bankr. D.Minn.1985) (citations omitted); *accord, In re Guerrerio,* 143 B.R. 605, 611 (Bankr. S.D.N.Y.1992). Some courts of appeals, however, hold that only actual reliance, not reasonable reliance, is necessary. *In re Allison,* 960 F.2d 481 (5th Cir.1992); *In re Ophaug,* 827 F.2d 340, 342–43 (8th Cir. 1987). Another court of appeals holds that only "justifiable reliance" is necessary. *In re Kirsh,* 973 F.2d 1454, 1457–59 (9th Cir. 1992). This unsettled issue need not be resolved here. I assume without deciding that reasonable reliance is required.

 Proof of the elements of § 523(a)(2)(A) would suffice to establish liability under the FCA. *See* 31 U.S.C. § 3729; *see, e.g., United States v. Veneziale,* 268 F.2d 504 (3d Cir.1959). But since the debtor's conduct amounted to fraud under § 523(a)(2)(A) (as is discussed below), there is no need to decide whether a debtor can discharge a debt based on conduct giving rise to liability under the FCA but not sufficient to establish actual fraud. *See* 31 U.S.C. § 3739(b) (no proof of specific intent to deceive required for liability under the FCA). Nonetheless, it is important to note that FCA liability is encompassed within liability for actual fraud as the parties' settlement agreement compromised claims under the FCA and for fraud at common law.

The elements for actual fraud are met here as indicated by the following undisputed facts. The debtor has admitted he knowingly submitted false statements to the government for the purpose of inducing the government to insure mortgages. The false information submitted formed the basis for the government agreeing to insure the mortgages, and the government acted reasonably in relying on the false representations contained in the insurance applications: the certification was necessary before an application could be granted and there is no evidence the government was on warning that the certification was false.[1] The debtor benefitted from the government insuring the mortgages as such insurance facilitated the sale of the real properties, which, in turn, resulted in the debtor obtaining money through sales proceeds or commissions. Finally, because the government agreed to insure the mortgages, it was required to settle numerous claims to its detriment when the various mortgagors defaulted.

 With respect to the specific intent element, the debtor maintains that he did not intend to cause the government losses. However, the government does not need to establish such an intent, but only that the debtor submitted false statements to induce the government to insure the mortgages. *Hames,* 53 B.R. at 871, 872. As the debtor has admitted this was his intent, the intent element is met.

 The debtor further maintains that he obtained no benefit, but that the lenders were the only ones to benefit. Some courts appear not to require a benefit by holding that it is of no consequence that third parties (*e.g.,* the purchasers of the HUD-insured properties) arguably were the primary beneficiaries of the fraud; a debtor need not actually procure money or property for himself for the debt to be nondischargeable. *In re Mann,* 40 B.R. 496, 499 (Bankr.D.Mass.1984); *In re Winfree,* 34 B.R. 879, 882–83 (Bankr.M.D.Tenn.

---

**1.** Moreover, to the extent that the Federal nondischargeability reliance element is but a reflection of non-bankruptcy law requirements of reliance to impose liability, *see Kirsh,* 973 F.2d at 1457, it could be argued that the settlement agreement resolved the issue. I have assumed, however, that bankruptcy nondischargeability law imposes a reasonable reliance requirement even if the FCA or common law fraud laws impose no reasonable reliance requirement.

1983). I need not resolve any conflict in the case law as to whether a benefit is required. For, assuming some benefit to the debtor were necessary, any benefit to the debtor is sufficient for a finding that the debtor obtained property within the meaning of § 523(a)(2)(A). *In re Luce*, 960 F.2d 1277, 1283 (5th Cir.1992). The benefit to the debtor set forth above (his obtaining sales proceeds or commissions) is sufficient to fulfill this requirement. Looking at it slightly differently, by fraud the debtor procured for third-parties HUD insurance, a form of property, in order to facilitate sales that he desired to accomplish. Thus, the debtor obtained property within the context of § 523(a)(2)(A) when he procured third-party loan guarantees that were for his benefit by facilitating sales in which he had an interest.

■ The debtor also renews his contention that the government cannot show that the false statements caused it to suffer detriment because any injury resulted from defaults by the mortgagors. For reasons discussed in part II of this decision, the settlement agreement fixed the amount of damages and bars the debtor from requiring the government to put on proof of causation. The amount of liability the parties agreed to under non-bankruptcy law standards of causation is plainly nondischargeable under whatever standards of causation are imposed by Federal bankruptcy nondischargeability law: the latter standards are at least as unfavorable to the debtor as the former.

In an analogous situation this court has held that the entire loss suffered by a creditor is the proper measure of the nondischargeable debt where the creditor advanced monies wholly in reliance on the debtor's misrepresentations. *In re Hecker*, 95 B.R. 1 (Bankr.D.D.C.1989); *see also Birmingham Trust Nat'l Bank v. Case*, 755 F.2d 1474, 1477 (11th Cir.1985). In *Hecker*, the debtor induced the making of a loan for less than adequate security by misrepresenting the nature of the collateral. But it turned out that the collateral would have been worth much less than the loan amount even if the debtor had been truthful. The debtor argued that the nondischargeable debt should be limited to what the lender would have recovered had the debtor been truthful. This court rejected the debtor's argument explaining that "[a] debtor whose misrepresentations induced the lender to make the entire loan in the first place is not entitled to the benefit of the scenario that would have unfolded had the debtor been truthful." 95 B.R. at 3.

■ In arguing that the defaulting mortgagors caused the government's losses, the debtor seeks to avoid responsibility for his actions much as the debtor in *Hecker* did. The government program at issue here required by law that the mortgagor make a downpayment as a pre-condition to obtaining federal mortgage insurance. Thus, absent the debtor's false statements, the government would never have been called upon to pay off the mortgages. The debtor is not entitled to escape or limit liability by laying the blame for the government's losses on the defaulting mortgagors where his false statements resulted in the government agreeing to insure the mortgages in the first place. *Cf. Hecker*, 95 B.R. at 2–3. Whatever standards of causation the parties applied in fixing the settlement amount of liability under non-bankruptcy law, whether the strict standard of *Hibbs*, or the more liberal standard of *First Nat'l Bank of Cicero*, 957 F.2d at 1374, the debt is nondischargeable under Federal nondischargeability standards. *See In re Tsamasfyros*, 114 B.R. 721, 725 (D.Colo. 1990), *aff'd*, 940 F.2d 605, 608 n. 4 (10th Cir.1991) (debtor may not collaterally attack state court's calculation of damages since dischargeability is an all or nothing proposition).

### IV

■ Few cases turn purely upon the binding effect of a settlement. But an analogy readily demonstrates that the settlement agreement should have binding effect here. This case is similar to cases in which the debtor and a creditor enter into a consent judgment in state court and the issue then is whether the consent judgment should be given binding effect. *See Kling-*

*man v. Levinson*, 831 F.2d 1292 (7th Cir. 1987); *In re Halpern*, 810 F.2d 1061 (11th Cir.1987); *In re Pearson*, 120 B.R. 396 (Bankr.N.D.Tex.1990). The lack of a judgment here is inconsequential: had the settlement agreement been sued upon, a judgment would have been granted.

■ The collateral estoppel question presented, when only the settlement agreement or consent judgment is relied upon, is whether by their agreement the parties not only intended to terminate the litigation of claims but also intended to determine finally the issues eventually presented in the dischargeability litigation. *Pearson*, 120 B.R. at 398. Here the settlement agreement included a disclaimer that Spicer was admitting liability.

■ However, when the settlement agreement does not establish an intent to fix the character of the debt, other evidence may be received to determine the character of the debt. A conviction or guilty plea can form the basis for collateral estoppel. *In re Jardula*, 122 B.R. 649 (Bankr.E.D.N.Y.1990); *In re Baker*, 108 B.R. 663 (Bankr.S.D.Ill.1990). When the nondischargeable *nature* of the debt is established by collateral estoppel or otherwise, a prior default judgment fixing the *extent* of the debt is accorded binding effect to prevent relitigation of the amount of the debt. *In re Comer*, 723 F.2d 737, 740 (9th Cir.1984); *In re Tsamasfyros*, 114 B.R. 721, 725 (D.Colo.1990), *aff'd*, 940 F.2d 605 (10th Cir.1991). Here the character of the debt is unquestionably nondischargeable. The amount of the debt, including all of its incidental components, is thus nondischargeable and has been fixed by the settlement agreement.

## CONCLUSION

In short, the court finds, on undisputed material facts, fraud on the part of the debtor and the compromise of claims grounded in that fraud resulting in the settlement debt of $339,000.00 in principal plus interest in accordance with the settlement agreement. Accordingly, the court holds, as a matter of law, that the debt for $339,000.00 is nondischargeable under

§ 523(a)(2)(A) of the Code. Summary judgment to this effect will be entered in favor of the government.