**In re Darius Zeb BREVARD, Joangelia Pierce Brevard, Debtors.**

**James MESTER, Plaintiff,**

**v.**

**Darius Z. BREVARD, et al., Defendants.**

**Bankruptcy No. 95–12640–SSM.
Adversary No. 95–1378.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Sept. 26, 1996.

838

Cheryl K. Brunner, Manassas, VA, for plaintiff.

Robert G. Mayer, Fairfax, VA, for debtors/defendants.

## MEMORANDUM OPINION

STEPHEN S. MITCHELL, Bankruptcy Judge.

This is an action to determine the dischargeability of a landlord's claim for damages resulting from the debtors' breach of a residential lease. The landlord asserts that the debt is nondischargeable because the debtors submitted a false financial statement as part of the lease application. The debtors assert that there was no intent to deceive, that any omissions were not material, and that the landlord's reliance on the statement was not reasonable. A trial was held on September 4, 1996. At the conclusion of the trial, the court raised *sua sponte* the question of whether a claim arising from the breach of a lease—where the tenant had paid rent through the period of actual occupancy but walked away from the property before the end of the lease—constituted "property, services, or an extension ... of credit" within the meaning of § 523(a)(2), Bankruptcy Code. The court took the matter under ad-

visement and invited the parties to submit post-trial briefs. The court has received the post-trial submissions of the parties and is now prepared to rule. For the reasons stated in this opinion, which constitutes the court's findings of fact and conclusions of law under Fed.R.Bankr.P. 7052, the court determines that the landlord's claim is dischargeable because the debtors, in failing to list more than the six monthly payment obligations for which space was provided on the rental application, did not have the requisite intent to deceive the landlord, and because the landlord's reliance on the application was not objectively reasonable when the landlord's own investigation showed that the information on the application was incomplete.

*Facts*

The debtors, Zeb Darius Brevard and Joangelia Pierce Brevard,[1] filed a voluntary chapter 7 petition in this court on June 20, 1995 and were granted a discharge on September 26, 1995. James Mester, their former landlord, filed a timely complaint in this court on September 12, 1995 to determine the dischargeability of his claim against the debtors.

Mester owned, and continues to own, a single-family detached house at 106 Salem Court, S.E., Leesburg, Virginia. He is not a professional landlord, and owns no real estate other than his own house. After he received a job offer out of the area, he decided to rent the house and, for that purpose, listed the property in April 1994 with Cecil Keene, a real estate agent. After the property had been listed for approximately 6 weeks, the debtors, both of whom were employed at the time by the Loudoun County Sheriff's Office—he as a deputy sheriff, she as a dispatcher—submitted a written rental application on May 7, 1994, through their own agent, Charles G. Dwyer. Relevant to the present controversy, the two-page application requested, in addition to information concerning employment and prior landlords, a listing of "Currently [*sic*] Monthly Obligations," with columns for the creditor's

name, the balance due, and the monthly payment. Six lines were provided. The debtors listed six creditors with aggregate monthly payments of $719.00. The debtors then signed the application in two places.

The application was submitted to Keene, who reviewed it and verified the information concerning current employment and prior landlords. He also made a preliminary calculation of the "debt burden before rent"—that is, the ratio (expressed as a percent) of the monthly payments shown on the application to the debtors' gross monthly income. The result was approximately 16%, which was well within the 25% to 35% range Keene considered to "acceptable in this area." Through his firm's management company, he then had a credit bureau report run. He was not shown the report, but was advised that it reflected six creditors in addition to those shown on the application. He was not told the names of the creditors but was told that the average monthly payment for those creditors was $40 per month. He then recalculated the debt burden to take into account an additional $240 per month in payments, and came up with a debt burden ratio of approximately 22%. He did not make any inquiry of the debtors concerning the additional creditors that had shown up on the credit report or why they had not been listed on the rental application. In his own mind he did not consider the omission of the six debts from the rental application to be a "red flag."

Keene faxed a copy of the rental application to Mester and relayed the information he had received concerning the credit report. Mester did not ask for any follow-up information from the debtors concerning the additional creditors. Mester did his own debt burden calculation. He testified that in his own mind he considered 25% to 30% to be "acceptable." Taking into account the debt burden calculation, the favorable reports from prior landlords, and the debtors' employment with the sheriff's office, he felt the debtors would be good tenants, and he agreed to rent to them for one year at $825.00 per month. He made his decision on

---

1. Subsequent to the filing of their chapter 7 petition the debtors were divorced. Mrs. Brevard then resumed using her maiden name of Pierce. She will be referred to in this opinion as Ms. Pierce.

approximately May 10, 1994, and either that day or shortly thereafter a lease was signed covering the period from May 1994 through May 1995.[2]

On August 22, 1994, the debtors gave two months written notice to Mester that they would be vacating the premises on October 27, 1994 "due to job relocation." Although there was one month that the rent payment was late, the debtors paid rent in full through October, 1994, when they left the property and moved to North Carolina. Mr. Brevard's mother, who lived in North Carolina, had medical problems, and Mr. Brevard hoped to obtain employment with the sheriff's office there. Unfortunately, the sheriff was defeated for reelection, and the employment did not materialize. The debtors then moved back to Virginia.

After the debtors vacated the property, Mester promptly relisted it for rent, but the property remained vacant through March 1995. The property was re-rented at the same rent that the debtors had agreed to pay. Mester paid the agent a $300 advertising fee to aggressively market the property and also paid a commission, when the new lease was signed, equal to one month's rent. Additionally, he testified that he had incurred at least $300 in charges to keep the utilities connected while the property was being marketed,[3] as well as approximately $12,500 in attorneys fees and litigation costs—of which he had paid approximately $4,000—pursuing his claim.

It is undisputed that the debtors did not list all their creditors on the rental application. Ms. Pierce[4] testified that she listed as many creditors as there were lines provided for that purpose and assumed that the others would be picked up on the credit report, which she knew would be run, and for which she had paid the agent a $20.00 fee. At the least, the following creditors were omitted: [5]

| Creditor | Monthly Payment |
| --- | --- |
| Loudoun Credit Union | $180.20 [6] |
| Navy Federal Credit Union | $158.74 |
| Cargo Furniture | $ 32.00 (approx) |
| Jewel Box | $ 35.00 to $37.00 |
| Montgomery Ward | $ 25.00 to $30.00 |
| Service Merchandise | $ 30.00 to $35.00 |

Additionally, at the same time they submitted the rental application, the debtors applied for loans from Loudoun Credit Union and Commercial Credit Loan, Inc. Both loans were approved on May 10, 1994, essentially contemporaneous with the approval of the lease. The loan with Loudoun Credit (which was in addition to the existing loan) was in the amount of $2,000 and required a bi-weekly payment of $44.45 (equivalent to a monthly payment of $95.88). The loan with Commercial Credit was for $3,115.06 and required a monthly payment of $102.75. At least a portion of the loan proceeds were used to pay the security deposit and first month's rent for the house.

### Conclusions of Law and Discussion

This court has jurisdiction of this controversy under 28 U.S.C. §§ 1334 and 157(a) and the general order of reference entered by the United States District Court for the Eastern District of Virginia on August 15, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Venue is proper in this district under 28 U.S.C. § 1409(a).

---

2. The lease was backdated to May 7, 1994. The tenancy commenced on May 13, 1994.

3. Under the lease with the debtors, the debtors were responsible for all utilities.

4. Mr. Brevard was not present at the trial and did not testify. His deposition, however, was admitted in evidence.

5. The plaintiff contends that other debts were omitted as well, but the court accepts Ms. Pierce's trial testimony and Mr. Brevard's deposition testimony that no child support payments were owed by Mr. Brevard at the time the rental application was submitted. The court also credits Ms. Pierce's testimony that the Commercial Credit loan had been paid off (although an application was pending for a new loan), that nothing was owed on the Belk Center, Inc., credit card, and that the bill from Sterling–Dulles Imaging Center was fully covered, and eventually paid, by medical insurance. Additionally, the court finds that there was no separate monthly payment obligation to Joseph and Jean Featherstone—Ms. Pierce's mother and stepfather. Rather, the Featherstones' account at Navy Federal Credit Union had been pledged as collateral for the Navy Federal Credit Union loan to the debtors, and the Featherstones therefore had a contingent claim against the debtors for indemnity.

6. Bi-weekly payment of $83.17 converted to equivalent monthly payment amount.

█ Under § 523(a)(2), Bankruptcy Code, 11 U.S.C. § 523(a)(2), a chapter 7 discharge does not discharge an individual debtor from a debt

> for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> \* \* \* \* \* \*
>
> (B) use of a statement in writing—
>
>> (i) that is materially false;
>>
>> (ii) respecting the debtor's or an insider's financial condition;
>>
>> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>>
>> (iv) that the debtor caused to be made or published with intent to deceive.

The creditor seeking the determination of nondischargeability has the burden of proof, and the standard of proof is by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

There is no question that the debtors, in support of their lease application, submitted to Mester a "statement in writing ... respecting [their] financial condition," on which Mester actually relied in making the decision to lease to them. There is also no question that the statement did not disclose all of the debts on which they were then making monthly payments and also did not disclose that they had applied for two loans simultaneously with the loan application that would significantly increase the amount of their monthly payments. The issues in dispute are (1) whether, under the unusual facts presented here, the debtors obtained "property ... or an extension ... of credit" by use of the statement; (2) whether the statement was "materially" false; (3) whether Mester's reliance on the statement was "reasonable;" and (4) whether the debtors made the statement "with the intent to deceive." If all these are answered in the affirmative, then the court must determine the amount of the plaintiff's damages resulting from the use of the statement, including the question of whether, in a nondischargeability proceeding under § 523(a)(2), attorneys fees, if other-

wise recoverable by law, are also nondischargeable.

## A.

The threshold issue of whether the Brevards obtained "property ... or an extension ... of credit" was raised by the court on its own motion. So far as the court can determine, no reported case has dealt with a factual situation precisely like that presented here—that is, where the debtors entered into a lease on the strength of a written financial statement and paid rent through the .period they actually occupied the premises, but then, after giving the landlord advance notice, left before the expiration of their lease and surrendered the premises to the landlord. It is clear that the landlord has a valid contract claim for the balance of the rent due under the lease (at least until he was able to relet the property); the question is whether that liability constitutes "a debt for ... property, services, or an extension ... of credit" as required by § 523(a)(2), Bankruptcy Code.

A leading treatise, quoting an early case construing § 17a(2) of the Bankruptcy Act of 1898, the predecessor to § 523(a)(2), Bankruptcy Code, observes "that the purpose of the law was to prevent the bankrupt *from retaining the benefits of property acquired by fraudulent means*" and that "[t]he mere fact that the liability arose in consequence of his fraud is not alone sufficient; the fraud must be followed and result *in a loss of property to the creditor*." 3 Lawrence P. King, Collier on Bankruptcy, ¶ 23.08, p. 523–44 (15th ed.1996) (emphasis added), quoting *Rudstrom v. Sheridan*, 122 Minn. 262, 142 N.W. 313 (1913). To be sure, there is authority that a nondischargeability action will lie under § 523(a)(2) where the debtor himself does not receive the proceeds of a loan induced through fraud, as long as the debtor receives at least an "attenuated" benefit from a loan made to a third party. *Ashley v. Church (In re Church)*, 903 F.2d 599 (9th Cir.1990) (loan arranged as "part of 'a business plan to gain a foothold in the ... industry' "). *See, also, U.S. v. Spicer (In re Spicer)*, 155 B.R. 795 (Bankr.D.D.C.1993) (government guaranty of mortgage loans to third parties, obtained as a result of real

estate broker's false statements, was "property" for purpose of § 523(a)(2)). But even under those scenarios, the lender has parted with his money and remains out of pocket, even though it is a third party who actually received the money.

█ Here, it is difficult, in a conceptual sense, not only to see what benefits of the lease the debtors have "retained," but also what "loss of property" the landlord has suffered. The debtors paid the rent for the entire period they occupied the property; this is not a case where they obtained the benefit of a roof over their head and then skipped out without paying rent. The landlord was never in any real sense deprived of the uncompensated use of his property. He was fully paid for the period the debtors occupied the property, and the moment they left (after giving him two months advance notice) and surrendered the premises, he was free to relet it—which he would have to have done in any event at the end of the lease—or to make any other use of it that an owner of real property is entitled to do.[7]

It is a truism that the statutory exceptions to dischargeability are narrowly construed in favor of the debtor. *Hagan v. McNallen (In re McNallen)*, 62 F.3d 619, 625 (4th Cir. 1995); *Blackwell v. Commonwealth of Va. Dept. of Taxation*, 115 B.R. 86, 88 (Bankr. W.D.Va.1990); *Cowher's Trucking, Inc. v. Zack (In re Zack)*, 99 B.R. 717, 721 (Bankr. E.D.Va.1989); *Standex Int'l GmbH v. Bosselait (In re Bosselait)*, 63 B.R. 452, 459 (Bankr.E.D.Va.1986). It is equally true, however, that, in construing the provisions of the Bankruptcy Code, a court must apply the plain language of the statute to the extent it is clear and unambiguous. *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240–1, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) ("[A]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute"); *Patterson v. Shumate*, 504 U.S. 753, 757, 112 S.Ct. 2242, 2246, 119 L.Ed.2d 519 (1992) ("the plain language of the Bankruptcy Code ... is our determi-

nant"). In this connection, there can be no serious dispute that a tenant's leasehold interest in real property constitutes "property" in the commonly-understood sense of that term. The debtors, upon entering into the lease, "obtained"—in exchange for the agreed rent—the right to use and occupy the property for an agreed term and were entitled to quiet possession during that term.

The court's attention has been drawn to only two reported cases involving real estate leases obtained on the strength of a false financial statement. In *Barwick v. Brewer (In re Brewer)*, 66 B.R. 214 (Bankr.S.D.N.Y. 1986), the debtor, in renting a house, had submitted a financial statement that grossly overstated her income. Six months into the one-year lease, she advised the landlord that she was unable to pay the rent and moved out owing two months back rent. The landlord was unable to relet the house for two and a half months and had to pay a substantial sum to a real estate agent to find a replacement tenant. Judge Schwartzberg, in reaching the conclusion that the debtor had obtained "property ... or an extension ... of credit," analyzed the issue as follows:

Very rarely does a court encounter a situation where a lessor claims reliance on materially false statements in writing with respect to the financial ability of a prospective lessee to perform under the terms and conditions of a lease for residential property. This is not usually regarded as a credit transaction because the lessee does not get to keep the property. The title to the property continues to be held by the lessor. However, this is a credit transaction to the extent that the lessee is obligated to pay for the right of possession which is transferred in exchange for the lessee's obligation to pay rent.... The lessee's right of possession under the lease is a property right which may be transferred or withheld depending on the creditworthiness of the lessee. Thus, the lessee obtains a valuable property right from the lessor in exchange for the lessee's obli-

---

7. There is no suggestion in the record that the property, when surrendered by the debtor, had depreciated in value (as might be the case, for example, if a debtor surrendered a leased automobile prior to the expiration of the lease).

gation to make payments in accordance with the terms of the lease.

66 B.R. at 217.

In the second case, *S.P. Investments L.P. v. O'Connor (In re O'Connor)*, 145 B.R. 883 (Bankr.W.D.Mich.1992), the debtors, who were husband and wife, had guaranteed an office lease for the husband's business. The landlord accepted the guarantee based on a financial statement that intentionally omitted a large loan. The office was constructed by the landlord to the tenant's specifications. The business never got off the ground, and the tenant vacated the premises one and a half months into a three-year lease. The landlord, although successful in reletting the space, suffered a net loss (including the cost of construction to meet the needs of the new tenant) of $42,841.34. Judge Nims was concerned, in view of the restrictive language in the early Supreme Court case of *Gleason v. Thaw*, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717,[8] as to whether a lease agreement constitutes "property" under § 523(a)(2). However, an analysis of subsequent Supreme Court decisions, including *Fidelity & Deposit Co. of Md. v. Arenz*, 290 U.S. 66, 54 S.Ct. 16, 78 L.Ed. 176 (1933)[9] and *Superior Bath House Co. v. McCarroll*, 312 U.S. 176, 61 S.Ct. 503, 85 L.Ed. 721 (1941), as well as several lower court cases dealing with equipment leases, led him to the same conclusion Judge Schwartzberg had reached in *Brewer*—namely that the interest acquired by a tenant under a lease of real property constitute "property" for the purpose of § 523(a)(2).

It is true that there are significant factual differences between *Brewer* and *O'Connor* on the one hand and the present case on the other. In *Brewer*, the tenant had left owing rent for the period she occupied the premises. In *O'Connor*, the landlord had expended funds to construct the offices to the original tenant's specifications and incurred additional out of pocket expenses to fit the space out

for the new tenant. However, in each case, the court's determination of damages also included the landlord's loss of rent for the period after the tenant moved out through the termination of the lease. Similarly, having carefully considered the issue, and finding no authority to the contrary, this court is constrained to conclude that the leasehold interest acquired by the debtors when they entered into the lease was "property" that was "obtained" from Mester, notwithstanding that the debtors subsequently surrendered the property to Mester and paid rent through the actual period of occupancy.

### B.

There is no question that the rental application the debtors signed was false in that it did not list all the monthly payments they were then obligated to make. In addition, it was, if not literally false, at least seriously misleading—not the "whole" truth—in omitting any reference to the two pending loan applications. While there was obviously no assurance that either loan would be granted, there is no evidence that the debtors were the least bit doubtful of their ability to obtain the loans, both of which were in fact granted. Their credit at that time was good, Ms. Pierce testified, and under the circumstances it seems likely that the debtors fully expected both loans to be approved—indeed, without such approval, it does not appear that they would have been able to pay the required security deposit on the house they were hoping to rent from Mester.

The question remains, however, whether the omissions from the rental application were "material," as required by § 523(a)(2)(B)(i). The exclusive use the landlord made of the information concerning the debtor's current monthly expenditures was to determine if the debtors could afford to make

---

8. "In view of the well-known purposes of the bankrupt law, exceptions to the operation of a discharge thereunder should be confined to those plainly expressed." *Id.*, 236 U.S. at 562, 35 S.Ct. at 289 (holding that the legal services provided by an attorney to a defendant accused of murder did not constitute "property").

9. " 'Property' is a word of very broad meaning, and ... reasonably may be construed to include obligations, rights, and other intangibles, as well as physical things." 290 U.S. at 68, 54 S.Ct. at 17 (holding that surety's agreement to be obligated on a bond was "property" for the purpose of the exception to discharge based on a false financial statement).

the rent payments. This would obviously be a matter of justifiable concern to any prudent landlord. For the purpose of determining if the debtors could afford to rent the house, Mester used the information on the rental application to compute a "debt burden before rent." This consisted of the ratio, expressed as a percent, of the debtors' required monthly payments (other than rent) to their gross monthly income. Their combined gross monthly income, as listed on the rental application, was $4,333.00. The $719.00 in monthly payments reflected on the application equated to a 17% burden. The six additional debts reported as being shown on the credit report added approximately $240 a month.[10] This would have equated to a 22% debt burden. The omission from the application of $240 per month in debt payments clearly was not "material" to Mester, since even taking them into account, he agreed to rent to the debtors.

However, as noted above by the court in its findings, the monthly payment obligations omitted from the credit application aggregated significantly more than $240 per month. The evidence shows that at least six obligations totalling approximately $472.94 per month were omitted. Adding these to the $719 per month listed on the rent application gives a total of $1,191.94 per month, which equates to a 28% debt burden. This is at the high end of the range (25% to 30%) that Mester testified he would find acceptable. If one adds to this debt burden the monthly payments to Loudoun Credit Union and Commercial Credit Loan, Inc. that the debtors incurred simultaneously with the lease,

their actual monthly debt burden came to $1,391 per month, or 32%, before rent. This is above the level that Mester testified he personally would have found acceptable, although it was within the range (25% to 35%) that Keene, his agent, testified that landlords in the area generally considered acceptable.

It was clear from Mester's testimony that debt burden, although by no means the only factor he considered in determining to rent to the debtors, weighed heavily in the decision. Mester was not a professional landlord with established criteria for extending credit, and in any event he was not required to accept a particular level of debt burden simply because other landlords might do so. At the same time, it seems unlikely that any particular percentage figure would have absolutely disqualified the debtors as tenants in his mind. Clearly, however, the higher the figure, the more carefully he would evaluate the totality of the circumstances. Given his testimony that he personally felt that a 25% to 30% debt burden was acceptable, and given the other factors—none of them negative—that he took into account, the court finds it highly probable that he would have rented to the debtors even had the rental application disclosed all six of the existing obligations that were omitted. The court also finds that, had he known about the two new debts being taken on at the same time as the lease, there is a significant likelihood that he would *not* have agreed to rent to the debtors. Since the omitted information could well have affected his decision, it was material within the meaning of § 523(a)(2)(B)(i).

10. The debtors objected on hearsay grounds to Keene's testimony concerning the contents of the credit report. The credit report itself was not introduced at trial and is apparently not available. Keene's testimony as to what a fellow employee told him the report contained was admissible on the issue of what Mester was told and, ultimately, of whether Mester reasonably relied on the rental application. For that purpose, neither the credit report nor the fellow employee's statement to Keene were being introduced for the truth of the matters stated in the report. However, the hearsay objection is well-taken to the extent the testimony was offered to prove that $240 in monthly obligations were in fact omitted. The report itself may well have qualified under the business record exception to the hearsay rule. Fed.R.Evid. 803(6); *U.S. Dept*

*of HUD v. Cost Control Marketing & Sales Mgt of Va, Inc.,* 64 F.3d 920, 926 (4th Cir.1995) (MLS listing admissible as business record; foundation could be laid by real estate agent familiar with system). But Keene himself did not see the credit report; his only information as to its content came from what a fellow employee told him. The employee's statement to Keene was not shown to qualify under any exception to the hearsay rule. Consequently, it cannot be considered as establishing the truth of the matter asserted, that is, that the debtors omitted from the rental application six debts with monthly payments of approximately $40.00 each. However, Ms. Pierce admitted in her testimony at trial that certain debts had been omitted, and the court's findings are based on that testimony.

## C.

 Although the court concludes that the rental application was materially false, that finding does not end the inquiry. Even if a creditor obtains a written financial statement from a debtor before extending credit, the resulting debt will not be nondischargeable unless the creditor relied on the statement and the reliance was "reasonable." Reasonable reliance is a more demanding standard than the "justifiable" reliance that is required where nondischargeability is predicated on fraud, false representations, or false pretenses under § 523(a)(2)(A). *Field v. Mans*, ── U.S. ──, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Congress required the higher level of reliance where nondischargeability is based on a false financial statement primarily because of the "peculiar potential of financial statements to be misused ... by creditors who know this bankruptcy law" and who "sometimes have encouraged such falsity by their borrowers for the very purpose of insulating their own claims from discharge." *Id.,* ── U.S. at ──, 116 S.Ct. at 447. Specifically, the legislative history reflects the following concern:

> It is a frequent practice for consumer finance companies to take a list from each loan applicant of other loans or debts that the applicant has outstanding. While the consumer finance companies use these statements in evaluating the credit risk, *very often the statements are used as a basis for a false financial statement exception to discharge.* The forms that the applicant fills out *often have too little space for a complete list of debts.*

*Id.* ── U.S. at ──, n. 13, 116 S.Ct. at 447, n. 13, citing H.R.Rep. No. 95–595, pp. 130–131 (emphasis added).

 Consistent with this concern, courts have not permitted creditors to claim reliance on a financial statement where the statement was erroneous on its face. *Beneficial Finance Co. v. Jackson (In re Jackson)*, 32 B.R. 549 (Bankr.E.D.Va.1983) (lender could not rely on financial statement as basis of nondischargeability where total indebtedness shown was less than the sum of the loans shown on the statement); *Dominion Bank v. Wingo (In re Wingo)*, 112 B.R. 141, 145 (W.D.Va.1990) ("Congress intended ... to prevent creditors from using a misrepresentation in a financial statement to prevent the debtor's discharge when, in fact, the financial statement played no meaningful part in the decision of the creditor to extend credit.") Although reasonableness implies an objective standard, *Field v. Mans, supra,* there is no bright line test. *Wingo, supra,* 112 B.R. at 145. One relevant inquiry is the extent to which "the creditor's actual conduct [comports] with (1) the creditor's own normal business practices, and (2) the standards and custom of the industry, (3) in light of the surrounding circumstances at the time the application was made and the credit extended." *Sovran Bank v. Allen (In re Allen)*, 65 B.R. 752, 763 (E.D.Va.1986), citing *Matter of Patch*, 24 B.R. 563, 567 (D.Md.1982). There are a number of circumstances in which courts have held a creditor's reliance on a financial statement *not* to be reasonable. These include:

> (1) where the creditor knows from past experience that the financial statement is not accurate, is incomplete, or inconsistent, or the statement is erroneous on its face; (2) where the statement contains obviously inadequate financial information (i.e., the application itself does not leave enough space to provide full financial information or it fails to solicit adequate information); (3) *where the creditor's investigation of the statement suggests its falsity or incompleteness;* and (4) where the creditor does not take the usual and customary steps and procedures typical in its own lending practice or in the lending industry in verifying the information provided by the debtor.

*In re Wingo, supra,* 112 B.R. at 144–145 (emphasis added; internal citations omitted). At the same time, there is no affirmative requirement that a creditor verify from external sources the information on a financial statement. *In re Allen, supra.*

 The problem here is simple. Mester did not rely solely on the rental application. Through his agent, he requested and received a credit bureau report. That report reflected six additional debts not listed on the rental application. Mester was therefore on actual notice that the application was incomplete. There could, of course, be a

number of explanations. The applicants may have misunderstood the scope of the information being requested, their memory may have played them false, or they may have intentionally omitted or misstated information. Indeed, the credit bureau report may itself have contained incorrect or outdated information. Faced with the discrepancy between what was listed on the rental application and what was shown on the credit report, however, the objectively reasonable response of someone intending to rely on the accuracy of the rental application would have been, at the least, to inquire of the debtors (1) why the additional debts reflected on the credit report were not listed on the rental application and (2) whether there were possibly other debts not listed.

This is not to say that every trifling discrepancy between the financial statement submitted by a debtor and information the creditor already knows or receives from other sources would require, for example, a face-to-face meeting with the debtor to reconcile the two, as was done in *Wingo, supra*. The question is one of objective reasonableness, taking into account all the circumstances. Here, however, the discrepancies were not minor—equally as many debts were omitted as were reported. Only six lines were provided on the application for current monthly expenses, and six debts were listed. The very fact that six additional debts were reflected on the credit report would logically suggest, at the very least, that the debtors may have misunderstood the application and believed they only had to list as many creditors as there were lines provided. Whatever the explanation, the failure to make any follow-up inquiry whatsoever was not objectively reasonable if the creditor intended to rely on the application as a primary basis for extending credit. To be fair, there is not the slightest suggestion that Mester sought the list simply to hold as his ace-in-the-hole in the event of a subsequent bankruptcy—the scenario discussed in the legislative history. But the statutory language is not limited to that type of situation. As a policy matter, Congress intentionally set a higher standard of reliance for false financial statements than it did for other kinds of false representations or fraud. The requirement on its face applies to creditors across the board and is not limited to small loan companies preying on unsophisticated consumers. That standard was not met in this case, and the court accordingly cannot find that Mester has carried his burden of proving that his reliance on the rental application was objectively reasonable.

## D.

The final element that must be considered on the issue of nondischargeability is whether the rental application was made or published "with intent to deceive." Certainly, once a statement is shown to be false, a trier of fact will usually be justified—in the absence of some evidence showing an innocent reason for the omissions or misstatements—in concluding that they were made with the intent to deceive. In this case, however, Ms. Pierce testified that she and her husband listed only six of their debts because only six lines were provided. She also testified that she expected and assumed that the additional creditors would be reflected on the credit report. She and her husband knew the credit report would be run, and in fact they had paid $20.00 for the cost of the report. Ms. Pierce also testified that no one explained that the information was to be used to calculate their debt burden, and that she assumed that the list was to be used as credit references.

Ms. Pierce's explanation is not inherently improbable, and the court, having had an opportunity to observe her demeanor on the witness stand, finds her testimony credible. The application did not in so many words require the listing of "all" monthly expenses, nor did the instructions direct, for example, that the reverse side or an additional sheet be used if more space was needed. Nor does the application state that the information will be used to determine the applicant's ability to pay. While it is certainly suspicious that two of the omitted debts were her and her husband's largest monthly payments aside from their car payment (which was disclosed on the rent application), there is no evidence that the debtors had any reason to believe or expect that those particular debts would not show up on a credit report. The unrebutted

testimony is that the debtors had good credit at the time. Although they had recently refinanced the Navy Federal Credit Union loan in order to obtain a lower monthly payment, the court cannot find that they were financially overextended or believed themselves overextended. In short, it does not appear that they would have felt a need to misrepresent their financial condition.

At bottom, the question of intent is a factual one. Although there is certainly some evidence in the record that would justify a finding of intent to deceive, the court, after carefully weighing all the evidence, including Ms. Pierce's demeanor on the witness stand, cannot find that the debtors, in failing to list all of their monthly payments on the rental application, intended to deceive Mester. Absent an intent to deceive, the debt to Mester is dischargeable even though, as an objective matter, the rental application was materially false and even if Mester's reliance on it had been reasonable.

### E.

In summary, the court finds that the debtors obtained "property ... or an extension ... of credit" by means of a materially false statement of their financial condition. The court also finds that Mester actually relied the statement, but that such reliance was not objectively reasonable when his own investigation showed that it was incomplete. Finally, the court finds that the debtors did not intend to deceive Mester and believed he would look to the credit report for a complete listing of their debts. Since under § 523(a)(2)(B) both reasonable reliance and an intent to deceive are essential elements of nondischargeability, the debt is not excepted from discharge. In

view of the court's findings on the issue of nondischargeability, it is not necessary to make findings or conclusions as to the amount of Mester's damages, including his claim for attorneys fees and litigation costs.

A separate judgment will be entered consistent with this opinion.[11]

---

11. Under § 523(d), Bankruptcy Code, if a creditor brings an adversary proceeding to determine the nondischargeability of a consumer debt under § 523(a)(2), and the debt is nevertheless discharged, the court is required to enter judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding "if the court finds that the position of the creditor was not substantially justified," unless "special circumstances" would make the award unjust. In this case, although the creditor's evidence did not ultimately carry the day, the court cannot find that his position was "substantially unjustified." Indeed, it is undisputed that the listing of

monthly payments on the rental application was incomplete. Given the magnitude of the omissions—including the nondisclosure of the two loans that the debtors had applied for simultaneously with submitting the loan application— Mester had substantial justification for seeking a determination of nondischargeability. Nothing in the record even remotely suggests that Mester pursued his action knowing he had no case or a weak case but hoping that the debtors would settle rather than incur the expense of defending the action. Accordingly, the court does not find that an award of attorneys fees to the debtors is appropriate.